J-S36001-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: B.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1282 EDA 2023 |

Appeal from the Order Entered May 3, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001078-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: J.B.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: B.W., FATHER | : | |
| | : | |
| | : | No. 1283 EDA 2023 |

Appeal from the Decree Entered May 3, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000624-2022

BEFORE: BOWES, J., NICHOLS, J., and KING, J.

MEMORANDUM BY BOWES, J.:                    **FILED NOVEMBER 16, 2023**

B.W. ("Father") appeals the May 3, 2023 decree involuntarily terminating his parental rights to his biological son, J.S. a/k/a J.B.S. ("J.B.S."), born in June 2019. He has also appealed the order entered on the same day

changing J.B.S.'s permanency goal to adoption.[1]  After careful review, we affirm the termination decree and the goal change order.

We glean the relevant facts and procedural history from the certified record, in particular the stipulated statement of facts that was accepted by all parties in these proceedings.  *See* N.T., 5/3/23, at 16;[2] Involuntary Termination Petition, 11/18/22, at Exhibit A.  The Philadelphia Department of Human Services ("DHS") first became involved with this family shortly after J.B.S. was born in June 2019, at which time D.S. ("Mother") and J.B.S. both tested positive for cocaine.  Father was present at the hospital.  He and Mother were unmarried and lived separately.

On June 27, 2019, DHS was awarded protective custody of J.B.S. and, at a shelter care hearing held the next day, the court determined that J.B.S. should remain in the custody of the agency.  J.B.S. was adjudicated dependent in July 2019 and was placed in a pre-adoptive foster home with M.A. and F.M. (collectively, "Foster Parents"), where he has remained during the entirety of these proceedings.  *See* N.T., 5/3/23, at 32.  The court established a permanency plan under which Father was directed to, *inter alia*, complete parenting classes, participate in visits with J.B.S., obtain stable housing, and

_____

[1]  The parental rights of J.B.S.'s biological mother, D.S. ("Mother"), were also involuntarily terminated on May 3, 2023.  She did not file an appeal.  By separate decree entered the same day, the trial court also terminated the rights of any potentially unknown father of J.B.S.

[2]  The transcripts of the termination hearing with respect to J.B.S. are mislabeled as having occurred on May 24, 2023.  *See* Trial Court Opinion, 6/16/23, at 1 n.2.

submit to in-home assessments.  He was initially scheduled to have bi-weekly supervised visits with J.B.S.

Between July 2019 and June 2020, Father did not comply with these directives or make any appreciable progress towards reunification.  Beginning in June 2020, however, he began to avail himself of the services being offered through the assigned community umbrella agency, Catholic Community Service ("CUA").  Father also began participating in regular, supervised visits with J.B.S.  In October 2020, Father progressed to unsupervised visits.  In January 2021, Father's visits with J.B.S. began to take place in Father's home.  During this period, Father was also reported to be in moderate to substantial compliance with his various permanency objectives.

Beginning in February 2021, however, Father's progress began to regress.  Specifically, on February 3, 2021, Father began "cursing" and "became aggressive" with CUA staff members during a pop-up visit performed during one of Father's unsupervised visits with J.B.S..  *See* Stipulation of Facts at ¶ y.  Two days later, Father dispatched "numerous text messages" to CUA wherein he accused the agency of conspiring against him and forcefully articulated his refusal to continue permitting them access to his home.  *Id*. at z.  Consequently, Father's visits with J.B.S. reverted to supervised visits outside of his home.  Of note, the trial court also ordered that Father undergo a psychological evaluation.  *Id*.

The permanency reviews conducted thereafter between March 2021 and January 2022 indicate that Father's compliance was rated from moderate to

substantial. He also resumed unsupervised visitations with J.B.S., which were expanded to overnight visits in January 2022.

During this same period, however, Father did not timely undergo his court-ordered psychological evaluation. Indeed, the trial court was forced to repeatedly direct Father to undergo such an evaluation in orders spanning an approximately seven-month period between March and October 2021.

Thereafter, Father's conflict with the supervising agencies escalated. On February 21, 2022, he was involved in an altercation with CUA coordinator Lance Wright during an attempted in-home assessment, wherein Father displayed "very paranoid" behavior and accused CUA of trying to intimidate him with what Father perceived to be implied threats of physical violence. N.T., 6/21/22, at 51-54. During this exchange, Father also intimated that he would not shrink from such threats and was "built" for such conflict. *Id*. Thereafter, Father also called and texted Mr. Wright in the early-morning hours repeating these assertions. *Id*.

Contemporaneously, Father escalated his concerns to CUA case manager Jennifer Bahn, who reported that Father's story changed several times when he related it to her and included new, uncorroborated allegations that Mr. Wright had "put his hands" on Father. N.T., 6/21/22, at 38-40. Father also contacted CUA director Lauren Spearman, who responded to these allegations by assigning alternative support staff to Father's case. *Id*. at 42-44. However, Father manifested the same paranoid reaction to these replacement CUA representatives by denying them access to his home and

- 4 -

baldly alleging that they were carrying firearms and attempting to sabotage his reunification with J.B.S. *Id*. Ultimately, on March 3, 2022, Father unilaterally terminated his cooperation with CUA. *Id*. at 44. Thereafter, Father's supervised visitations were administered solely by DHS.

On March 14, 2022, Father participated in a "mental health therapy session" at Greater Philadelphia Health Action ("GPHA"), which confirmed that Father was suffering from paranoia and depression. *See* Stipulation of Facts at ¶ gg. On June 21, 2022, the trial court ordered Father to engage with the course of mental health treatment recommended by GPHA and sign releases to provide CUA access to his mental health treatment plan and progress notes. However, Father took no immediate action.

In July 2022, a new CUA case manager, Nathaniel Jerome Mitchell, was assigned to Father's case and again attempted to gain access to Father's home to perform an assessment. *See* N.T., 5/3/23, at 36-37. Undeterred, Father continued to refuse any access to his residence. *Id*.

On September 15, 2022, the trial court again ordered Father to engage in mental health treatment through GPHA and also directed him to undergo a second psychological evaluation for the purposes of medication management. *See* Permanency Review Order, 9/15/22. Father did not comply.

On November 18, 2022, DHS filed a petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a) and (b).[3] The trial court held a termination hearing on May 3, 2023, at which point J.B.S. was three years old. Therein, DHS adduced testimony from Mr. Mitchell and introduced the records from the dependency docket. *See* N.T., 5/3/23, at 13. Father testified on his own behalf. The same day, the trial court entered a decree terminating his parental rights pursuant to § 2511(a)(1) and (2), and § 2511(b). The trial court also filed an order changing J.B.S.'s permanency goal from reunification to adoption, which was dated May 3, 2023.

On May 21, 2023, Father filed timely notices of appeal to this Court at both above-captioned cases, along with respective concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

_____

[3] The record is silent concerning the appointment of legal interest counsel for J.B.S. as contemplated in 23 Pa.C.S. § 2313(a) ("The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents."). It is clear, however, that James Winston Martin, Esquire, served as J.B.S.'s guardian *ad litem* during the termination hearings and advocated in his best interests. As it relates to our duty to determine whether the trial court determined whether counsel could simultaneously represent the child's best interests and legal interest, *i.e.*, his preferred outcome, insomuch as the certified record established that J.B.S. was three years old at the time of these proceedings and incapable of articulating a well-settled preference with respect to termination, we observe no structural defect in the underlying proceedings pursuant to § 2313(a). *See In re T.S.*, 192 A.3d 1080, 1092-93 (Pa. 2018) (holding that where "the preferred outcome of a child is incapable of ascertainment" the mandate of § 2313(a) "is satisfied where the court has appointed an attorney-guardian *ad litem* who represents the child's best interests during such proceedings."). We note with displeasure that Attorney Martin neglected to file a brief in this appeal.

The trial court has filed a consolidated Rule 1925(a)(2)(ii) opinion explaining its reasoning, which largely referred to its on-the-record statements at the conclusion of the May 3, 2023 hearing. Upon application from Father, we have consolidated these cases for adjudication pursuant to Pa.R.A.P. 513.

Father frames a single issue for our consideration: "Whether the trial court committed reversible error when it changed the goal to adoption and involuntarily terminated [F]ather's parental rights under 23 Pa.C.S. § 2511(a)(1), (2), and (b) where such determinations were not supported by clear and convincing evidence?" Father's brief at 6. Although stated as a singular claim for relief, Father is actually challenging both the goal change order and the termination decree on identical grounds, *i.e.*, sufficiency of the evidence. We address each of these distinct allegations *seriatim*, beginning with the termination decree.

Our standard of review in this context is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial

courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa.Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed at statute by 23 Pa.C.S. § 2511 of the Adoption Act, which necessitates a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination pursuant to § 2511(a)(1)-(11). *M.E.*, *supra* at 830. If the trial court determines a petitioner has established grounds for termination under at least one of these subsections by "clear and convincing evidence," the court then assesses the petition under § 2511(b), which focuses upon whether termination will serve the child's developmental, physical and emotional needs and welfare. *Id*. (citing *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)); *see also* 23 Pa.C.S. § 2511(b). This Court "need only agree with any one subsection of § 2511(a), in addition to § 2511(b), in order to affirm the termination of parental rights." *T.S.M.*, *supra* at 267.

Our analysis in the instant proceedings implicates § 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

To satisfy § 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa.Super. 2021). Grounds for

- 9 -

termination pursuant to § 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id*. (citing *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010)). On this point, we emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id*.

Turning to Father's first claim for relief, he is essentially arguing that there was insufficient "clear and convincing" evidence to support the trial court's finding that termination was warranted pursuant to § 2511(a)(2), arguing that he "did not cause [J.B.S.] to be without the essential parental care or subsistence necessary for [his] physical or mental well-being." Father's brief at 19. We must disagree.

Specifically, the trial court identified Father's incapacity for the purposes of § 2511(a)(2) as his unaddressed mental health problems. *See* N.T., 5/3/23, at 131 ("Father's mental health is the incapacity[.]"). In particular, the trial court placed great weight upon Father's displays of anger in the presence of J.B.S., which had also caused the child to seek refuge from the parties supervising the visitations. *Id*. The trial court also concluded that Father's mental health issues meant that "he does not have the capacity to care for [J.B.S.]" *Id*. at 132. Finally, the trial court noted Father's inability to take reasonable, proactive steps to address his psychological issues over the course of nearly one year, which it found demonstrated that Father's incapacity would not be addressed. *Id*. at 131-32.

Father's incapacity due to mental health troubles is not reasonably disputed in the certified record. **See** Stipulation of Facts at ¶ gg (demonstrating that Father's initial mental health evaluation indicated that he suffered from paranoia and depression). Indeed, Father testified himself that his "anger" was the primary concern identified by GPHA staff during his limited interactions with that agency. **See** N.T., 5/3/23, at 83-86. Ms. Bahn and Ms. Spearman both testified to instances in which Father's paranoia led to aggressive behavior during the dependency proceedings. **See** N.T., 6/21/22, at 38-44. Mr. Mitchell similarly reported Father's paranoid behavior during visitations, which included profane outbursts and belittling comments. **See** N.T., 5/3/23, at 25-26, 49-51. We observe no abuse of discretion in the trial court's finding that Father's mental health constitutes an incapacity pursuant to § 2511(a)(2).

Mr. Mitchell also testified that Father's inability to master his emotions undermined his ability to parent J.B.S. and raised concerns about the child's safety and well-being. Specifically, he stated, "[Father], I don't think, can protect that child." **Id**. at 52 The trial court found this frank testimony to be credible. **Id**. at 131. The record supports this finding and, as such, we will not disturb it. Accordingly, we find no abuse of discretion with the trial court's finding that Father's incapacity caused J.B.S. to be deprived of essential parental care.

Finally, our review of the certified record also reflects that Father's incapacity cannot or will not be remedied. Indeed, Father conceded that he never followed up on seeking further mental health treatment after suffering what he described as a "mental breakdown" between approximately December 2022 and May 2023. *Id*. at 83-86, 96-98. Despite acknowledging these unaddressed problems, Father could offer no explanation for why he had failed to undertake prudent or diligent efforts to ameliorate them. *Id*. It is also not clear that Father is even amenable to treatment, as he has already completed a course of anger management, Menergy, without any appreciable improvement in his condition. *Id*. at 77-78. As such, we can find no abuse of discretion in the trial court's finding that his incapacity cannot or will not be remedied.

Based upon the foregoing, we conclude that the trial court did not abuse is discretion or legally err in holding that involuntary termination of Father's parental rights was warranted pursuant to § 2511(a)(2).

We now turn to § 2511(b), which concerns whether J.B.S.'s developmental, physical, and emotional needs and welfare will be best served by terminating Father's parental rights. *See* 23 Pa.C.S. § 2511(b). Our High Court recently provided the following guidance relevant to our review: "Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085,

1105 (Pa. 2023). This determination "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id*. at 1106. Accordingly, there is no "exhaustive list" of factors that must be considered in this context. *Id*. at 1113 n.28.

Nonetheless, our Supreme Court has also mandated that a court's § 2511(b) analysis must include "consideration of the emotional bonds between the parent and child." *T.S.M.*, *supra* at 267. Thus, the court must determine whether the "trauma" caused by sundering the parent-child bond is "outweighed by the benefit of moving the child toward a permanent home." *Id*. at 253 (cleaned up). The recognized threshold for this finding is that the court must determine whether termination will sever a "necessary and beneficial relationship," such that the child "could suffer extreme emotional consequences." *K.T.*, *supra* at 1110. The High Court has emphasized, however, that such consequences must constitute more than mere proof of "an adverse or detrimental impact from severance of the parental bond" in order to preclude termination. *Id*. at 1113.

Our case law reflects that a court's analysis pursuant to § 2511(b) is not narrow but must include consideration of "intangibles such as love, comfort, security, and stability." *T.S.M.*, *supra* at 267. Indeed, our Supreme Court has affirmed that "the parental bond is but one part of the overall subsection (b) analysis." *K.T.*, *supra* at 1113. Thus, "courts must not only consider the

child's bond with the biological parent, but also examine the . . . love, comfort, security, and stability the child might have with the **foster** parent." ***K.T.***, ***supra*** at 1111 (emphasis in original) (cleaned up). In conformity with this instruction, courts should also consider factors that naturally arise due to the particular facts of a case, such as: (1) the child's need for permanency and time in foster care; (2) whether the child is in a pre-adoptive home and bonded with foster parents; and (3) whether the foster home meets the child's needs. ***Id***. at 1113.

With respect to the mandated bond analysis discussed above, Mr. Mitchell testified that J.B.S. has a bond with Father and refers to him as "Daddy" during visits. ***See*** N.T., 5/3/23, at 45. However, Mr. Mitchell also testified that J.B.S.'s true parental bond was with Foster Parents, who have attended to his everyday needs for the virtual entirety of his life. ***Id***. at 28-32. For this reason, Mr. Mitchell averred that termination would not cause undue harm to J.B.S. ***Id***. To the contrary, Mr. Mitchell testified that J.B.S. needed permanency more than anything else, which Father could not provide. ***Id***. Moreover, he also confirmed that J.B.S. is happy, loved, and well-cared-for in the custody of Foster Parents. ***Id***. at 28-32, 43-44. Indeed, Mr. Mitchell stated his belief that J.B.S. would suffer "grief" if he were to be removed from Foster Parents' care. ***Id***. at 43-44. As noted above, the trial court credited Mr. Mitchell's testimony and, as the record supports this conclusion, we will not disturb its findings on this point. ***Id***. at 131.

Thus, we find no abuse of discretion or error of law in the trial court's holding that termination was warranted pursuant to § 2511(b). Therefore, we affirm the decree involuntarily terminating Father's parental rights.

We now turn to Father's separate challenge of the trial court's order changing J.B.S.'s permanency goal from reunification to adoption. While this challenge is at least arguably moot following our decision to affirm the trial court's termination decree, *see In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa.Super. 2021), we address it in an abundance of caution.

This Court reviews a trial court's permanency determination for an abuse of discretion. *See Interest of J.B.*, 296 A.3d 1234 (Pa.Super. 2023). In this context, an abuse of discretion occurs only if the record reflects that the court's judgment was manifestly unreasonable, it did not correctly apply the law, or its action was the result of partiality, prejudice, bias or ill will. *See Interest of H.J.*, 206 A.3d 22, 25 (Pa. Super. 2019) (cleaned up). We must "accept the findings of fact and credibility determinations of the trial court if they are supported by the record," but we are not bound by the trial court's "inferences or conclusions of law." *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). This Court defers to the trial judges, "who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan." *Id*. We are "not in a position to reweigh the evidence and the credibility determinations of the trial court." *Id*.

As noted *supra*, the substance of Father's challenge to the goal change order overlaps his termination-related contentions. Essentially, he argues that the goal change was not warranted because he previously satisfied his objectives and had been granted unsupervised at-home visitations with J.B.S. before the onset of the altercations with the CUA case workers. **See** Father's brief at 17-21. This assertion fails for the same reason that we affirm the decree terminating his parental rights. Stated succinctly, while we commend Father for the strides that he made at certain stages of the dependency proceedings, even achieving overnight visitations with J.B.S, Father was unable to control is erratic behavior, and that persistent behavior undermined his ability to provide the child with proper care and supervision. After forty-seven months of services, Father remains unable to reunify with his son. N.T., 5/3/23, at 25-26. In this vein, Mr. Mitchell, the CUA case manager, testified that no additional services or support are available to assist Father's attempts to reunify at this juncture. **Id**. at 30-31. Hence, the court did not abuse its discretion in changing the permanency goal from reunification to adoption.

Based on the foregoing, we affirm both the decree terminating Father's parental rights and the order changing the permanency goal to adoption.

Decree affirmed. Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/16/2023