J-S11004-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3000 EDA 2023 |

Appeal from the Order Entered January 3, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000447-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: S.K.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3001 EDA 2023 |

Appeal from the Decree Entered November 16, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000326-2023

BEFORE:   BOWES, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY BOWES, J.:                    **FILED JUNE 06, 2024**

M.S. ("Mother") appeals from the November 16, 2023 decree terminating her parental rights to her minor child, S.J. born in August 2016.[1]

---

[*] Retired Senior Judge assigned to the Superior Court.
[1] The child's father is deceased.

She also appeals the juvenile court's January 3, 2024 order changing S.J.'s permanency goal to adoption.[2]  We affirm.

The Philadelphia Department of Health services ("DHS") was previously involved with the family in 2016 and 2019, first, after receiving a General Protective Service ("GPS") report that Mother tested positive for phencyclidine ("PCP") during the birth of S.J., and then based on concerns with S.J.'s failure to thrive and potential domestic violence in the home.  DHS closed both cases after Mother agreed to a safety plan and volunteered to receive services.

Two years after DHS closed the latter case, it received a GPS report alleging that Mother had been arrested for operating a motor vehicle under the influence of a controlled substance.  Then-four-year-old S.J. was a passenger in the vehicle, and Mother admitted to ingesting PCP.

On May 28, 2021, the juvenile court adjudicated S.J. dependent and the agency continued the child's kinship care placement with C.S., a maternal cousin, who is a pre-adoptive resource.[3]  The court ordered Mother to, *inter alia*, submit to a behavioral health evaluation and drug screening, engage in

---

[2] Appellant purported to challenge the goal change by appealing the November 16, 2023 order that was entered concomitant to the decree terminating parental rights.  However, that order did not direct a goal change to adoption, but instead continued the status quo. On January 3, 2024, the juvenile court amended the November 16th order to confirm the goal change.  While Mother's notice of appeal is premature in relation to the January 3, 2024 order, we do not quash it. ***See Johnston the Florist, Inc. v. TEDCO Const. Corp.***, 657 A.2d 511 (Pa.Super. 1995)(an appeal filed prior to the entry of a final order will be treated as timely filed).

[3] Although the notes of testimony refer to this witness as S.S., the certified record confirms the correct spelling is C.S.

- 2 -

a dual diagnosis assessment, and to attend the Achieving Reunification Center ("ARC") for parenting, housing, and employment training. Thereafter, the Community Umbrella Agency ("CUA") assigned to the family crafted a single case plan ("SCP") that outlined the foregoing court-ordered goals and required Mother to attend supervised visitations with S.J. for two hours per week.

Initially, Mother complied moderately with these directives and made modest progress towards reunification with S.J. However, her cooperation declined during the ensuing two-and-one-half years. For example, Mother eventually failed to maintain consistent attendance at the visitations, which were increased to three times per week but never progressed beyond supervised in-home contact with S.J., and ultimately reverted to supervision at the agency during September 2023 because Mother triggered an alcohol-related altercation at the home of C.S., the kinship placement resource. More importantly, while Mother completed the initial in-patient dual diagnosis program, she failed to complete the concomitant outpatient substance-abuse treatment, periodically tested positive for marijuana and alcohol, missed the last six scheduled drug screens, and permitted her substance abuse to interfere with the in-home visitations.

On August 24, 2023, DHS filed a petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a) and (b). The trial court held a termination hearing on November 14 2023, at which point S.J. was seven years old. Mother failed to attend the evidentiary hearing but she was represented by counsel. Likewise, the court appointed separate counsel

and *guardian ad litem* to represent S.J.'s legal interest and best interests, respectively. DHS adduced testimony from Mikayla Williams, the CUA Case manager assigned to the family, and C.S., both of whom the trial court expressly deemed credible. *See* N.T., 11/16/ 23, at 20, 27. C.S. testified about the frequency and quality of Mother's visitations with S.J., and the nature of the September 15, 2023 incident.

The trial court reconvened on November 16, 2023, for S.J.'s counsel to update the court about the child's legal interest and for the parties and the guardian *ad litem* to present their respective legal arguments. Thereafter, the trial court stated from the bench its rationale for terminating Mother's parental rights pursuant to § 2511(a)(1), (2), (5), and (8) and § 2511(b).

Although Mother attended the November 16, 2023 proceeding, the trial court removed her from the hearing after she engaged in obstreperous behavior. As the court referenced this outburst in its on-the-record statement of rationale, we discuss it herein. Specifically, as the trial court was presenting the basis for its decision, Mother rejected the court's characterization of the September 15, 2023 incident as follows:

THE MOTHER: That's a fucking lie.

. . . .

THE COURT: I'm sorry. It's not time for you to speak in the court.

THE MOTHER: It's hearsay though.

- 4 -

THE COURT: You can excuse yourself if you'd like or you can stay and remain quiet. Those are your option.

THE MOTHER: You don't even -- you all just -- this is hearsay.

THE COURT: Get the sheriff.

THE MOTHER: I'm fighting for my son here.

THE COURT: Get the sheriff.

THE MOTHER: And you're just talking about – you weren't there.

. . . .

THE COURT: [Mother], you can be excused from the courtroom.

THE MOTHER: No, I've been quiet for two years. I've been quiet for two years.

. . . .

THE MOTHER: Allowing you all to run whatever circus and show that you all decided to choose for me. You all chose this for me and my child. I was -- I show way bigger and better every single day for my son. I provide for my son. I work and take care of my child without nobody asking me for nothing. I do what I have to do for my child. You're going to sit here and try to tell me that I failed to do what.

THE COURT: [Mother], you need to remove yourself.

. . . .

THE COURT: [Mother], you need to leave the courtroom.

THE MOTHER: I got a video of her pushing my son with fucking (unintelligible) and them smoking and drinking around my child.

COURT OFFICER: We do care about your child (inaudible).

THE MOTHER: No, the fuck you all don't because you're not there when I'm trying to see my son.

COURT OFFICER: (inaudible)

THE MOTHER: You all don't see [the] real me. I am his mother. I went [through] a lot of pain. Nobody cares. [To y]ou all . . . this is paperwork. This is my real life.

THE COURT: [Mother], you need to leave.

THE MOTHER: Terminate my fucking rights. You want to speak for my -- don't touch me.

THE COURT: Let the record reflect that [M]other has left the courtroom. Mother's outburst in this courtroom further demonstrates her ability to rationally operate. It causes me to question both her mental state . . . and whether she's worked on her drug and alcohol issues conducted by the way she acted in this courtroom today.

N.T., 11/16/23 at 22-25. Thereafter, the court entered the decree terminating Mother's parental rights and filed the above-referenced goal change order, as amended by the January 3, 2024 order that is currently on appeal.

Mother filed timely notices of appeal to this Court at both above-captioned cases, along with respective concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a consolidated Rule 1925(a) opinion which largely referred to its on-the-record statements at the conclusion of the November 16, 2023 hearing. We consolidated the appeals for disposition.

Mother present the following issues for our review:

1) Whether the trial court abused its discretion and erred as a matter of law in terminating [M]other's parental rights when DHS failed to meet its burden that termination of parental rights was warranted under 23 Pa.C.S. 2511(a) and (b).

2) Whether the trial court abused its discretion and erred as a matter of law in changing the permanency goal to adoption from reunification as there was not competent evidence that it was in the best interests of the child.

Mother's brief at 8.[4]

Our standard of review in this context is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

---

[4] DHS, J.S.'s legal counsel, and the guardian *ad litem*, each filed a separate brief in favor of affirming the trial court's termination decree and goal change order.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa.Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed at statute by 23 Pa.C.S. § 2511 of the Adoption Act, which necessitates a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination pursuant to § 2511(a)(1)-(11). *M.E.*, 283 A.3d at 830. If the trial court determines a petitioner has established grounds for termination under at least one of these subsections by "clear and convincing evidence," the court then assesses the petition under § 2511(b), which focuses upon whether termination will serve the child's developmental, physical and emotional needs and welfare. *Id*. (citing *In re T.S.M.*, 283 A.3d 251, 267 (Pa. 2013)); *see also* 23 Pa.C.S. § 2511(b). This Court "need only agree with any one subsection of § 2511(a), in addition to § 2511(b), in order to affirm the termination of parental rights." *T.S.M.*, 283 A.3d at 267.

Our analysis in the instant proceedings implicates § 2511(a)(8) and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and

termination of parental rights would best serve the needs
and welfare of the child.

. . . .

**(b) Other considerations.**—The court in terminating the rights
of a parent shall give primary consideration to the developmental,
physical and emotional needs and welfare of the child.  The rights
of a parent shall not be terminated solely on the basis of
environmental factors such as inadequate housing, furnishings,
income, clothing and medical care if found to be beyond the
control of the parent.  With respect to any petition filed pursuant
to subsection (a)(1), (6) or (8), the court shall not consider any
efforts by the parent to remedy the conditions described therein
which are first initiated subsequent to the giving of notice of the
filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

In order to satisfy the requirements of § 2511(a)(8) in the case at bar,

DHS was required to produce clear and convincing evidence that: (1) S.J. has

been removed from Mother for at least twelve months; (2) the conditions

which led to his removal continue to exist; and (3) involuntary termination of

parental rights would best serve the child's needs and welfare. ***See Interest***

***of M.E.***, 283 A.3d 820, 832 (Pa.Super. 2022).  Notably, Mother's willingness

or ability to remedy the conditions that led to S.J. placement is not pertinent

to our review. ***Id***.  Instead, "[t]he relevant inquiry regarding the second prong

of § 2511(a)(8) is whether the conditions that led to removal have been

remedied and thus whether reunification of parent and child is imminent at

the time of the hearing." ***Id***.  (quotation and citation omitted).  "Further, the

Adoption Act prohibits the court from considering, as part of the § 2511(a)(8)

analysis, "any efforts by the parent to remedy the conditions described in the

petition which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b). *Id*. (cleaned up).

S.J. has been in DHS's care since May 28, 2021, due to Mother's substance abuse and mental health problems. As DHS filed the instant petition to terminate Mother's parental rights on August 24, 2023, approximately twenty-seven months later, the agency satisfied the threshold requirement concerning twelve-months placement. Next, we address whether Mother's substance abuse problems continue to exist.

Challenging §§ 2511(a)(5) and 2511 (a)(8) collectively, Mother contests the trial court's determination that there was clear and convincing evidence regarding her persistent substance abuse. First, Mother highlights that she completed the court-ordered thirty-day dual diagnosis inpatient treatment program at Kirkbride Center ("Kirkbride") during May 2021, periodically participated in programs at Gaudenzia Addiction Treatment ("Gaudenzia") and SOAR over the course of the dependency case, and engaged Pinnacle Treatment Centers ("Pinnacle") approximately one-month before DHS filed the petition to terminate her parental rights. Mother's brief at 9-10, 21. Then, limiting the salient issue to her abuse of PCP, Mother contends that there is no evidence in the record to suggest that she ingested that substance since the April 2019 traffic incident. *Id*. at 21. While she ultimately concedes the "extensive testimony concerning some alcohol use . . . and trace amounts of alcohol . . . in her random drug screens," Mother stresses that she was only

observed to be intoxicated on one occasion and has consistently engaged in outpatient substance abuse programs. *Id*. In sum, Mother asserts that because she remained active in "her abstinence from illegal substances," the statutory basis to terminate her parental rights did not exist. *Id*. at 22. For the following reasons, we disagree.

Instantly, the trial court determined that Mother's substance abuse problems persisted, stating its rationale from the bench, as follows:

> Mother's outburst today [raises] questions [about] her stability. She originally was testing positive for PCP, but the [c]ourt . . . has significant concern as to her use of drugs and alcohol at this time as demonstrated today [and] by the incident that happened on September 15. . . . [M]other's failure to appear for this last six drug screens leads this [c]ourt to believe she would likely test positive for something in her system, whether it be PCP, alcohol, or marijuana. Mother did not appear for those six screens and has not demonstrated an ability to have clean screens for the life of this case.

N.T., 11/16/ at 27-28. The trial court further determined,

> Mother has had two years to demonstrate an ability to follow the recommendations that she received when she completed her thirty days of outpatient. She has not successfully completed any outpatient drug and alcohol program.
>
> She has been testing positive throughout this case for different substances. She's tested positive for marijuana. She's showed traces of alcohol. She appeared at the resource home apparently under the influence with alcohol in her hand.

*Id*. at 26.[5]

_____

[5] While the trial court proffered this portion of the discussion concerning Mother's enduring substance abuse in reference to 2511(a)(5), the relevant
*(Footnote Continued Next Page)*

- 11 -

The certified record supports the trial court's characterization of Mother's continuing substance abuse and belies her claimed progress toward absolute abstention. While Mother protests that she no longer uses PCP, Ms. William's testimony demonstrated that Mother failed to complete her substance abuse treatment, and tested positive for marijuana, alcohol, and other "undisclosed substances." N.T., 11/14/23, at 21-22, 24, 31-32. Indeed, she was discharged from Gaudenzia due to non-attendance, and her participation level at SOAR was assessed to be as a low as fifty percent. *Id*. at 21-22. Similarly, Ms. Williams pointed out both that Mother's 11th hour re-engagement with Pinnacle followed a prior discharge for non-attendance, and that Mother neglected to provide the agency any information about the program beyond the fact that she is receiving counseling services. *Id*. at 34. As to the positive drug screens for undisclosed substances, Ms. Williams further explained, "SOAR was not able to disclose to us what [substance Mother] was testing positive for." *Id*. at 32. Hence, Mother could have abused PCP and SOAR simply refused to report the specific result. Moreover, Mother neglected to appear for all six random drug screens between May 2023 and November 2023, which are all presumed positive, and which further prevented

---

component of that subparagraph contains identical language regarding "the conditions which led to the removal or placement of the child continue to exist." 23 Pa.C.S. § 2511(a)(5). As Mother assails the court's findings concerning her substance abuse, generally, this portion of the trial court's rationale is equally relevant to the 2511(a)(8) analysis.

the court from confirming Mother's alleged non-ingestion of PCP. *Id*. at 23, 25, 75. Hence, the record simply does not sustain Mother's assertion of sobriety, generally, or her claim that she has not used PCP, specifically.

Finally, as to the third component of § 2511(a)(8), relating to S.J.'s best interests, Ms. Williams stated that Mother is incapable of satisfying the child's needs. *Id*. at 26-27, 37. We have outlined the pertinent consideration thusly: "Although § 2511(a) generally focuses on the behavior of the parent, the third prong of § 2511(a)(8) specifically 'accounts for the needs of the child.'" *Interest of M.E.*, 284 A.3d at 832 (quoting *In Re C.L.G.*, 956 A.2d 999, 1008-09 (Pa.Super. 2008) (*en banc*)). As explained in more detail in our analysis of § 2511(b), the trial court did not err in prioritizing S.J.'s need for permanence and security over his lingering attachment to Mother. Here Ms. Williams testified, "if [Mother] is using [intoxicants], she cannot ensure safety for the child. . . . . [S]he's not showing us . . . consistency in her being clean, and that's a big part of this." *Id*. at 26-27. As Ms. William's testimony supports the trial court's "significant concerns as to" Mother's stability and ability to maintain sobriety, we do not disturb the court's determination pursuant to §2511(a)(8) that the termination of parental rights serves the child's best interest by providing him the permanency and security that Mother cannot. N.T., 11/26/23, at 27.

Based upon the foregoing we find no abuse of discretion with the trial court's determination that S.J. has been removed from Mother for at least

twelve months, the conditions which led to his removal continue to exist, and termination of parental rights would serve the child's needs and welfare. Accordingly, the trial court did not err in terminating Mother's parental rights pursuant to § 2511(a)(8).

Having found that the record supports the trial court's determination as to § 2511(a), we turn to § 2511(b), which concerns whether S.J.'s developmental, physical, and emotional needs and welfare will be best served by terminating Mother's parental rights. *See* 23 Pa.C.S. § 2511(b).

Our High Court recently provided the following guidance relevant to our review of the trial court's needs and welfare analysis: "Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). This determination "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id*. at 1106. Accordingly, there is no "exhaustive list" of factors that must be considered in this context. *Id*. at 1113 n.28.

Nonetheless, our Supreme Court has also mandated that a court's § 2511(b) analysis must include "consideration of the emotional bonds between the parent and child." *T.S.M.*, 283 A.3d at 267. Thus, the court must determine whether the "trauma" caused by sundering the parent-child bond is "outweighed by the benefit of moving the child toward a permanent

home." *Id*. at 253 (cleaned up). The recognized threshold for this finding is that the court must determine whether termination will sever a "necessary and beneficial relationship," such that the child "could suffer extreme emotional consequences." *K.T.*, 296 A.3d at 1110. The High Court has emphasized, however, that such consequences must constitute more than mere proof of "an adverse or detrimental impact from severance of the parental bond" to preclude termination. *Id*. at 1113.

Our case law reflects that a court's analysis pursuant to § 2511(b) is not narrow but must include consideration of "intangibles such as love, comfort, security, and stability." *T.S.M.*, 283 A.3d at 267. Indeed, our Supreme Court has affirmed that "the parental bond is but one part of the overall subsection (b) analysis." *K.T.*, 296 A.3d at 1113. Thus, "courts must not only consider the child's bond with the biological parent, but also examine the . . . love, comfort, security, and stability the child might have with the **foster** parent." *K.T.*, 296 A.3d at 1111 (emphasis in original) (cleaned up). In conformity with this instruction, courts should also consider factors that naturally arise due to the particular facts of a case, such as: (1) the child's need for permanency and time in foster care; (2) whether the child is in a pre-adoptive home and bonded with foster parents; and (3) whether the foster home meets the child's needs. *Id*. at 1113.

Mother argues that the record does not support the trial court's conclusion that terminating parental rights would not cause S.J. significant

irreparable harm. Mother's brief at 25. Essentially, she highlights the portions of the record that support her position that S.J. enjoys his visitation with Mother and would desire to live with her if different circumstances existed. *Id*. at 26. She continues that, considering the current level of conflict between Mother and C.S. following the September 2023 incident, the child will be unable to maintain a relationship with Mother, thereby severing "something in existence that [is] necessary and beneficial to [S.J.] and would [cause] significant irreparable harm to [him]." *Id*. at 26-27. For the following reasons, we disagree.

The trial court's needs-and-welfare analysis acknowledged that S.J. has positive feelings toward Mother and enjoyed their visits. N.T. 11/16/23, at 28. However, it also highlighted the fact that S.J. was fully aware that Mother neglected to serve the role of a parental figure and S.J. does not look to her in that manner. *Id*. The court reasoned,

> [Mother] does not participate in dealing with his educational needs. She does not participate in dealing with his medical needs. To the contrary, the clear and convincing testimony is that she thinks he doesn't have these issues when clearly he does.
>
> So it is not a parent child bond that [S.J.] has with his mother. Wanting to see her does not mean that he has a parent and child bond. He also wants to see other people that he likes to visit. But being a visitation resource that he enjoys [spending] time with when she decides that she is going to show up does not establish a parent child bond. And I find that this young child, who has been in a loving home with family for over two years, will not suffer irreparable harm [if M]other's rights [are] terminated.

*Id*. at 28-29.

We discern no abuse of discretion with respect to the trial court's analysis. The record contradicts Mother's assertion that termination would cause irreparable harm.

C.S. testified about her relationship with S.J., the September 2023 incident, and her supervision of Mother's in-home visitations between October 2022 and September 2023. First, concerning her relationship with S.J., C.S. testified that S.J. has thrived in her care for approximately three years, and that he looks to her for care and assistance. N.T., 11/14/23, at 89. C.S. discussed S.J.'s assimilation into the pre-adoptive kinship foster-home and the bond shared between them. She testified that S.J. wanted to remain in her care permanently and visit Mother occasionally. *Id*. at 95, 96, 101. Regarding Mother's concern that she would be shut out of her son's life if the court terminated her parental rights, C.S., a maternal cousin, rejected that notion unequivocally, stating "I would never keep him from his mother." *Id*. at 97.

As to serving the child's needs and welfare, C.S. explained that she navigated S.J. through the process of dental surgery, ensured that he maintained proper nutrition, and administered to his educational and mental health needs. *Id*. at 90-102. Specifically, S.J. had several cavities when he came into her care and C.S. was responsible for securing dental surgery. *Id*. 90-91. Mother's role was limited to making an appointment and signing a release for the child to receive anesthesia. *Id*. at 90. Mother even failed to

attend the surgery despite her agreement to be present for the child. *Id*. at 91. Likewise, Mother resisted helping C.S. combat the child's undernourishment and poor weight gain, as she did not believe that was medically necessary. *Id*. at 98. In this regard, C.S. testified, "I reached out to her to tell her about . . . his weight gain and everything because I needed her help with the Pediasure that he takes daily. . . . That was the last thing we talked about because to her, he has no medical problems." *Id*. Mother also is resistant to discussing S.J.'s educational needs and behavior issues because "she feels as though he doesn't need [educational services], and that he has behavioral issues because he needs to be with his mom." *Id*. at 99. C.S. confirmed that Mother failed to attend any school meetings, even going so far as ignoring the meetings concerning S.J.'s individual education plan ("IEP") because she objected to him having an IEP. *Id*. at 101-02. Likewise, she has never asked for contact information for his mobile therapist, although she met the therapist by chance during a supervised visitation at C.S.'s home. *Id*. at 102. In addressing the foregoing issues in Mother's absence, C.S. performed the parental role that Mother could not.

As to the September 2023 altercation with Mother, C.S. stated that Mother appeared at C.S.'s residence with a can of alcohol behaving drunk and aggressive. *Id*. at 86. Mother attempted to engage another person in a physical altercation, antagonized C.S. with a veiled threat that she was carrying a firearm, and twice called the police on C.S.: first, to report that C.S.

was holding S.J. hostage; and later, to claim that C.S. assaulted her physically. *Id*. S.J. was present in the home at the time, but C.S. moved him and the other children out of harm's way. *Id*. at 87-88. Since that incident, the supervised visitations occurred at the agency. *Id*. at 13.

Finally, C.S. discussed the visitation log that she maintained while supervising Mother's visitations with S.J. between October 2022 and September 2023. *Id*. at 83-85; DHS Exibit-7. C.S. used the log to record Mother's attendance after the visitations were moved to the kinship home to alleviate the need for S.J. to go to the agency three times per week. *Id*. at 85, 88-89. C.S. reported that Mother frequently missed the supervised visitations, attending only approximately one-third of the twelve visits scheduled monthly. *Id*. at 85. ("I guess it would be 12 visits a month. She probably came [to] about four or five" per month). However, when Mother did attend the visitations, her interactions with S.J were positive and the child enjoyed the interactions. *Id*. at 91-92.

Similarly, as discussed *supra*, Ms. Williams also testified about the parent-child relationship, observing that S.J. is not bonded with Mother and does not look to her for parental care. N.T. 11/14/23, at 39. Instead, S.J.'s parental bond is with C.S., who has attended to his daily needs for approximately three years. *Id*. at 37-38. Ms. Williams explained, "[S.J.] views himself as one of [C.S.'s] children." *Id*. at 37. She also confirmed that S.J. wants to remain with C.S. permanently. *Id*. at 39.

Likewise, Ms. Williams corroborated that Mother attended supervised visitations sporadically, missing approximately sixty-eight of the 141 scheduled visitations. *Id* at 16. While her failure to appear at the visitations initially upset S.J., the missed visits affected him progressively less as Mother continued to visit inconsistently. *Id*. at 16-17. Ms. Willaims reported, "[h]e doesn't ask about her as much. When I would see him and he hadn't seen her in a while he would ask about her, but as time went on, he stopped asking about her as much." *Id*. at 18.

She also verified Mother's limited role in S.J.'s educational needs and medical care. *Id*. at 18-19. While there is testimony that Mother scheduled at least one medical appointment and ultimately signed a release for permitting the use of anesthesia for his dental care, she did not attend any school or medical appointments. *Id*. at 19, 77-78. Again, Ms. Williams confirmed that Mother did not believe that the services were needed. *Id*. at 20.

For these reasons, Ms. Williams averred that the termination of Mother's parental rights would not cause irreparable harm to S.J. because "[h]e doesn't view her as a caregiver [or] look to her for anything." *Id*. at 39. To the contrary, expressing the importance of having a stable, supportive parental figure, she testified that S.J. would be "devastated" if he were removed from C.S.'s household, particularly, in light of the child's educational and medical needs. *Id*. at 37.

As noted above, the trial court credited the testimony of C.S. and Ms. Williams and, since the record supports the court's conclusion, we will not disturb its findings on this point. N.T., 11/16/23, at 20. Moreover, consistent with the High Court's instruction in *K.T.*, the trial court reconciled the child's affection for Mother with the other relevant factors relating to S.J.'s need for permanency, the existing parent-child bond that he shares with C.S., and the fact that C.S. is a pre-adoptive resource that has satisfied the child's needs for approximately three years. *See K.T.*, 296 A.3d at 1113. Thus, we find no abuse of discretion or error of law in the trial court's holding that termination was warranted pursuant to § 2511(b). Therefore, we affirm the decree involuntarily terminating Mother's parental rights.

We now turn to Mother's separate challenge to the trial court's order changing S.J.'s permanency goal from reunification to adoption. While this challenge is at least arguably moot following our decision to affirm the trial court's termination decree, *see In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa.Super. 2021), we address it in an abundance of caution.

This Court reviews a trial court's permanency determination for an abuse of discretion. *See Interest of J.B.*, 296 A.3d 1234 (Pa.Super. 2023). In this context, an abuse of discretion occurs only if the record reflects that the court's judgment was manifestly unreasonable, it did not correctly apply the law, or its action was the result of partiality, prejudice, bias or ill will. *See Interest of H.J.*, 206 A.3d 22, 25 (Pa.Super. 2019) (cleaned up). We must

"accept the findings of fact and credibility determinations of the trial court if they are supported by the record," but we are not bound by the trial court's "inferences or conclusions of law." *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). Our review is deferential to the trial courts, "who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan." *Id*. We are "not in a position to reweigh the evidence and the credibility determinations of the trial court." *Id*.

Mother's challenge to the goal change order overlaps her termination-related contentions. Essentially, she argues that the goal change was not warranted because she "was active in her goals, had almost daily contact with the child and should have been afforded more time to complete her goals." *See* Mother's brief at 28. Hence, she asserts that competent evidence did not support the goal change. *Id*. at 27-28. This assertion fails for the same reason that we affirm the decree terminating Mother's parental rights. Stated succinctly, Mother's persistent substance abuse undermined her ability to provide her son with proper care and supervision. After approximately three years of services, Mother remains unable to reunify with her son. Hence, the court did not abuse its discretion in changing the permanency goal from reunification to adoption. *See In re R.M.G.*, 997 A.2d 339, 347 (Pa.Super. 2010) (observing, a court cannot subordinate a child's need for permanence and stability to a parent's claim of progress).

Based on the foregoing, we affirm both the decree terminating Mother's parental rights and the order changing the permanency goal to adoption.

Decree affirmed. Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/6/2024