J-A10041-23

2023 PA Super 100

IN THE INTEREST OF: J.B., A MINOR      :      IN THE SUPERIOR COURT OF
                                       :            PENNSYLVANIA
                                       :
APPEAL OF: MONROE COUNTY               :
CHILDREN AND YOUTH SERVICES            :
                                       :
                                       :
                                       :
                                       :      No. 3020 EDA 2022

Appeal from the Order Entered October 25, 2022
In the Court of Common Pleas of Monroe County Juvenile Division at
No(s):  CP-48-DP-0000048-2019

IN THE INTEREST OF: J.B., A MINOR      :      IN THE SUPERIOR COURT OF
                                       :            PENNSYLVANIA
                                       :
APPEAL OF: MONROE COUNTY               :
CHILDREN AND YOUTH SERVICES            :
                                       :
                                       :
                                       :
                                       :      No. 3021 EDA 2022

Appeal from the Order Entered October 25, 2022
In the Court of Common Pleas of Monroe County Juvenile Division at
No(s):  CP-48-DP-0000049-2019

IN THE INTEREST OF: J.B., A MINOR      :      IN THE SUPERIOR COURT OF
                                       :            PENNSYLVANIA
                                       :
APPEAL OF: MONROE COUNTY               :
CHILDREN AND YOUTH SERVICES            :
                                       :
                                       :
                                       :
                                       :      No. 3022 EDA 2022

Appeal from the Order Entered October 25, 2022
In the Court of Common Pleas of Monroe County Juvenile Division at
No(s):  CP-48-DP-0000050-2019

J-A10041-23

IN THE INTEREST OF: J.B., A MINOR : IN THE SUPERIOR COURT OF
                                  :        PENNSYLVANIA
                                  :
APPEAL OF: MONROE COUNTY          :
CHILDREN AND YOUTH SERVICES       :
                                  :
                                  :
                                  :
                                  :
                                  : No. 3023 EDA 2022

Appeal from the Order Entered October 25, 2022
In the Court of Common Pleas of Monroe County Juvenile Division at
No(s): CP-48-DP-0000051-2019

BEFORE:   PANELLA, P.J., KING, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                          **FILED JUNE 9, 2023**

Monroe County Children and Youth Services ("the Agency") appeals
from the juvenile court's orders dated October 12, 2022, and entered October
25, 2022, denying the Agency's request to change the permanency goals of
J.B. (IV), born in July 2019; J.B. (II), born in December 2012; J.B. (I), born
in April 2010; and J.B. (III), born in September 2018 (collectively, "the
Children"), from reunification to adoption.[1]   After review, we reverse and
remand.

The subject family became known to the Agency in July 2019, when
K.L., the mother of J.B. (II), J.B. (III), and J.B. (IV), tested positive for

_____

[*] Former Justice specially assigned to the Superior Court.

[1] As an order granting or denying a goal change in a dependency proceeding
is appealable, this matter is properly before this Court.  **See In re H.S.W.C.-
B.**, 575 Pa. 473, 478, 836 A.2d 908, 911 (2003).

- 2 -

oxycodone at the birth of J.B. (IV). **See** Notes of Testimony ("N.T."), 3/28/22, at 8. The Agency obtained emergency protective custody of the Children on September 10, 2019, after the arrest of J.B. ("Father"), the father of all four of the children, and K.L. on drug-related and weapons-related charges.[2, 3] N.T., 10/12/22, at 54, 59; N.T., 3/28/22, at 8-9. At the time, L.G., the mother of J.B. (I), was also incarcerated on unrelated assault charges in New York.[4] N.T., 10/12/22, at 52; N.T., 3/28/22, at 16-17. The court transferred legal and physical custody of the Children to the Agency, and the Agency placed the Children in foster care. **See** Shelter Care Orders, 9/13/19; **see also** N.T., 3/28/22, at 9, 12, 25.

_____

[2] The family additionally had an extensive history of referrals with child services in New York and a history of domestic violence. **See** Petitioner's Exhibit 4, 3/28/22 (NY Office of Children and Family Services Documentation).

[3] K.L. and Father were charged with, *inter alia*, multiple counts of manufacture, delivery, or possession with intent to manufacture or deliver, as well as criminal conspiracy; receiving stolen property; multiple counts of endangering the welfare of a child; multiple counts of possession of a prohibited firearm; possession of a firearm with the manufacturer number altered; altering/obliterating the mark or identification of a firearm and conspiracy related thereto; and multiple counts of possession of a controlled substance and use of drug paraphernalia. **See** Petitioner's Exhibits 5 & 6, 10/12/22 (Criminal Dockets). K.L. and Father additionally faced drug-related charges in New York. **See** Petitioner's Exhibits 38 & 39, 3/28/22 (Criminal Charges).

Notably, the initial Agency caseworker, Monique Henry, related drug and weapons concerns, as well as housing concerns. **See** N.T., 3/28/22, at 8-9, 20.

[4] For clarity, we refer to K.L. and L.G. by their initials hereinafter. We refer to Father, K.L., and L.G. collectively as "Parents."

The court adjudicated the Children dependent on September 25, 2019, and maintained the Agency's legal and physical custody and the Children's placement in foster care. The court further established permanency goals of reunification with concurrent goals of adoption as to the Children. **See** Orders of Adjudication and Disposition, 9/25/19. Thereafter, the Agency created Child Permanency Plans setting forth goals aimed at reunification, including that Parents, *inter alia*: (1) resolve pending criminal issues; (2) establish and maintain appropriate housing; (3) maintain financial stability; (4) maintain a healthy and loving relationship with the child(ren); and (5) maintain communication with the Agency. Father and K.L. were additionally required to live a drug-free and sober lifestyle. **See** Petitioner's Exhibits 3 & 45, 3/28/22 (Child Permanency Plans); **see also** Petitioner's Exhibits 30, 31, & 36 (letters to Parents regarding their goals).

K.L. was released on bail on October 8, 2019. Father was extradited to New York in February 2020 and released on bail on February 24, 2020. After his release, he resumed living with K.L., as he had prior to their arrests. The Agency received referrals relating to abuse and/or neglect of the Children by Parents, in March and April 2020, which were deemed valid. **See** N.T., 3/28/22, at 50, 52-53. Additionally, Ms. Amoroso confirmed reports of domestic violence committed by Father, as well as continuing drug concerns.

*See* N.T., 10/12/22, at 76; *see also* N.T., 3/28/22, at 53.[5] L.G. was ultimately released in April 2020. Father then subsequently surrendered to authorities in New York on February 3, 2022, and he remained incarcerated in New York.

J.B. (II), J.B. (III), and J.B. (IV) have been in foster care since September 2019, and they have been placed together in the same foster home since January 2020.[6] J.B. (I), who had additionally been placed in that home since January 2020, was moved to another foster home in May 2022, after an incident with the foster father. *See* N.T., 10/12/22, at 11, 29, 38-39, 42-46, 61-62; *see also* N.T., 3/28/22, at 43. However, both foster homes are pre-adoptive resources for the Children. *See* N.T., 10/12/22, at 63-64.

Throughout the ensuing dependency proceedings, the court maintained the Agency's legal and physical custody and the Children's placement in foster care, as well as permanency goals. The Agency filed petitions for goal changes from reunification to adoption as to the Children on November 13, 2020, which the court denied on December 14, 2020. *See* Permanency Review Orders, 12/23/20.

---

[5] J.B. (II) similarly testified that Father hit her, J.B. (I), and her mother. *See* N.T., 10/12/22, at 34.

[6] J.B. (III) and J.B. (IV) were placed together in this home prior to January 2020. N.T., 3/28/22, at 43.

Approximately eight months later, the Agency again filed petitions for goal changes on July 16, 2021. The court conducted hearings on March 28, 2022, and October 12, 2022. Parents were all represented by counsel. Likewise, the Children were represented by a guardian *ad litem* Brandie Belanger, Esquire.[7]

At the March 28, 2022, hearing, the Agency presented the testimony of caseworkers, Monique Henry[8] and Jamie Amoroso. Father was incarcerated at the time of the hearing and, consequently, he was not present. Both L.G. and K.L. were present.[9]

During the October 12, 2022, hearing, the court interviewed J.B. (I), then 12 years old, and J.B. (II), then nine years old, *in camera*, with counsel present. The Agency then continued with its presentation of the testimony of Ms. Amoroso. L.G. also testified on her own behalf *via* telephone. K.L. was

_____

[7] Attorney Belanger argued in favor of a goal change to adoption with a concurrent goal of reunification. **See** N.T., 10/12/22, at 131-33. She additionally submitted a brief to this Court, wherein Attorney Belanger argues that the juvenile court abused its discretion by denying the Agency's goal change petitions.

[8] Ms. Henry was the initial caseworker until the case was transferred to the placement unit on October 7, 2019. **See** N.T., 3/28/22, at 7, 22, 25.

[9] The notes of testimony suggest that K.L. arrived late to the proceeding. **See** N.T., 3/28/22, at 32; **see also** N.T., 10/12/22, at 39.

present but did not testify on her own behalf. Father remained incarcerated and again was not present and did not present any evidence.[10]

By orders dated October 12, 2022, and entered October 25, 2022, the juvenile court denied the Agency's request to change the Children's permanency goals from reunification to adoption.[11] Thereafter, on November 23, 2022, the Agency filed timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte* on December 20, 2022.

On appeal, the Agency raises the following issue for our review, "Did the [juvenile] court abuse its discretion by refusing to change the goal for the four minor children from [reunification] to adoption?" The Agency's Brief at iv (unnecessary capitalization omitted).

_____

[10] The Agency further proffered a great number of exhibits at both hearings. The court admitted Petitioner's Exhibit Nos. 1 through 13, 16 through 22, 24, 25, 27 through 33, and 35 through 63 from March 28, 2022. The court likewise admitted Petitioner's Exhibit Nos. 1 through 10 from October 12, 2022. Additionally, K.L. submitted and the court admitted K.L.'s Exhibit No. 1. N.T., 10/12/22, at 98.

[11] While the guardian *ad litem* and K.L. both indicate in their briefs that J.B. (I)'s dependency has since been terminated, this is not reflected in the certified record. Therefore, as we may only consider that which is in the certified record, we proceed with appellate review as to J.B. (I). **See Commonwealth v. Preston**, 904 A.2d 1, 6 (Pa.Super. 2006) (*en banc*).

Our standard of review concerning a juvenile court's permanency determination is abuse of discretion. *In re A.B.*, 19 A.3d 1084, 1088 (Pa.Super. 2011). As our Supreme Court has stated,

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record[] but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.,* 608 Pa. 9, 26, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

The Court explained:

> Not only are our trial judges observing the parties during the hearing, but usually, as in this case, they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court.

*Id.* at 27, 9 A.3d at 1190.

The Juvenile Act governs proceedings to change a child's permanent placement goal. *See* 42 Pa.C.S.A. §§ 6301-6375. Trial courts must apply the following analysis in considering a request to modify such goals:

> Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act [42 Pa.C.S.A. §§ 6301–65], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and

long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents.

Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. . . .

**A.B.**, 19 A.3d at 1088-89 (internal citations and quotation marks omitted).

In relation to the significance of the best interest of the child, we also

noted:

[T]he focus of all dependency proceedings, including change of goal proceedings, must be on the safety, permanency and well-being of the child. The best interest of the child takes precedence over all other considerations, including the conduct and the rights of the parent. [W]hile parental progress toward completion of a permanency plan is an important factor, it is not to be elevated to determinative status, to the exclusion of all other factors.

*In the Interest of M.T.*, 101 A.3d 1163, 1175 (Pa.Super. 2014) (citing *In re A.K.*, 936 A.2d 528, 534 (Pa.Super. 2007)). Further, there is no minimum period of time that a child's goal must be set at reunification before it can be changed. *See In re M.S.*, 980 A.2d 612 (Pa.Super. 2009). As indicated, "a child's life simply cannot be put on hold in the hope that the parent will

summon the ability to handle the responsibilities of parenting." In re **N.C.**, 909 A.2d 818, 824 (Pa.Super. 2006) (quoting **In re Adoption of M.E.P.,** 825 A.2d 1266, 1276 (Pa.Super. 2003)).

The Agency argues the Children have been in care for over three years and Parents have yet to satisfy all of their goals aimed at reunification despite the services and efforts of the Agency. **See** Agency Brief at 16-18. The Agency recognizes K.L.'s pending charges in Pennsylvania, as well as her guilty plea and sentence of five years' probation in New York, which requires her to reside in New York. **Id.** at 16. As such, the Agency maintains that K.L. had not resolved her criminal charges and failed to maintain appropriate housing. **Id.**

Further, the Agency contends that housing likewise remained an issue for L.G., who resided two hours away in New York, and was facing a denial of an ICPC[12] due to her lack of communication with the appropriate entities in New York. **Id.** The Agency further notes L.G.'s complaints regarding her current housing and indication of her desire to move. **Id.** at 16-17. Moreover, the Agency emphasizes L.G.'s acknowledgment of an eviction notice. **Id.** at 17.

Finally, the Agency notes Father remained incarcerated. Therefore, while he engaged in virtual visitation, he, too, had not resolved the goals of

---

[12] ICPC refers to the Interstate Compact on the Placement of Children.

maintaining appropriate housing or financial stability. *Id.* at 17. As the Children have been dependent for 37 months, in excess of the statutory requirement, as recognized by the juvenile court, the Agency asserts that the court ignored the best interests of the Children to establish permanency. *Id.*

The Agency avers:

These children have languish[ed] in foster care for over three years. [T]heir parents continue to struggle to achieve their goal and objectives while the [C]hildren grow up being cared for by others. . . . [A]ll three parents continue to be unable to resolve all of the hurdles in their lives[,] whether they be housing, criminal cases, financial stability[,] or drug and alcohol concerns.[13]

*Id.* at 17-18 (footnote added).

In denying the Agency's petition for a goal change, the juvenile court concluded that, although the Children had been adjudicated dependent for 37 months, which exceeded the requirements of 42 Pa.C.S.A. § 6351(f)(9), K.L. and L.G. had achieved some of the goals outlined in the permanency plan. For instance, the juvenile court found that, although one of the goals for K.L. was to resolve any criminal charges pending against her, and her criminal case

---

[13] K.L. asserts the Agency failed to argue in its brief how the juvenile court's determination was not supported by the record and failed to cite to the record as to any factual averments regarding K.L. As such, K.L. contends the Agency has waived its claims with respect to her. K.L.'s Brief at 6-8. While we note with disapproval the general inartful nature of the Agency's brief, in particular the failure to cite to the record as to K.L. in the argument section, we decline to find waiver on this basis as the briefing deficiencies do not hamper our appellate review. We discern the general issues raised and related argument. *See* Pa.R.A.P. 2101 (relating to briefing requirements).

had not yet proceeded to the sentencing phase, her pending criminal charges were tied to Father's criminal case, over which K.L. had no control as it was dependent on the trial court's calendar. Juvenile Court Opinion ("J.C.O."), 12/21/22, at 5, 8-9 (citations to record omitted). The juvenile court also noted K.L. and L.G. have met the goal of maintaining a healthy and loving relationship with the Children. *See id.* In this regard, the court noted the testimony of J.B. I and J.B. II revealed a strong bond with K.L. *See id.* K.L. has not missed any visits and frequently brought activities to do with the Children. *See id.* The trial court further noted J.B. II testified she would like to see K.L. more times each week. *See id.*

While we acknowledge the juvenile court's conclusion that some strides had been made by the parents to meet the permanency goals, upon review, we conclude the juvenile court abused its discretion in denying the Agency's requested goal changes with respect to the Children.

For example, as to L.G., mother of J.B. (I), twelve years old at the conclusion of the hearing, the goals of housing and contact with the Agency remained unachieved, as confirmed by Ms. Amoroso. N.T., 10/12/22, at 68. Ms. Amoroso acknowledged that L.G. had acceptable income based upon her monthly SSI income, as well as Section 8 housing.[14] N.T., 10/12/22, at 53,

---

[14] L.G., however, testified that she "just recently started working" after being unemployed for a year. N.T., 10/12/22, at 105. Ms. Amoroso was unaware of any new employment. *Id.* at 66.

68; **see also** N.T., 3/28/22, at 101, 144-45. However, L.G. missed some visitation due to illness and transportation issues, and she was "inconsistent" with in-person and virtual visitation. N.T., 10/12/22, at 53-54, 66-67.

Moreover, Ms. Amoroso testified that she recently received notification of a denial of a second ICPC request to assess L.G.'s home in West Chester County, New York, due to L.G.'s lack of communication with the appropriate agencies in New York.[15] **Id.** at 51-52, 65-66; **see also** Petitioner's Exhibit 7, 10/12/22 (ICPC email). Although L.G. reported she is currently involved in the ICPC process and has an appointment scheduled related to the next step of the process, she shared complaints about the home and expressed her desire to move. N.T., 10/12/22, at 101-04 ("I had to call the building department on my landlady because she has not been…attending to her responsibilities….I have made several official complaints in regards to my concerns…that I have never experienced in six years of living here."). She additionally reported receipt of an eviction notice, despite questioning its legality and factual basis, given her Section 8 Housing voucher. **Id.** at 104 ("I'm also dealing with an eviction notice. However, I don't owe any rent….I'm also a Section 8 recipient…So[,] there's no rent owed, and there's no judge that has evicted me….So[,] what she is doing is illegal."). Ms. Amoroso also

---

[15] A prior ICPC was also denied due to L.G.'s lack of communication. **See** Petitioner's Exhibit 57 (ICPC transmittal memo); **see also** N.T., 3/28/22, at 96, 99.

recounted ongoing issues concerning L.G.'s communication with the Agency and, when asked if L.G. stays in contact with her, she replied, "No." *Id.* at 52-54, 91.

Next, as to K.L., mother of J.B. (II), J.B. (III) and J.B. (IV), nine, four, and three years old at the conclusion of the hearing, respectively, the evidence revealed that K.L. satisfied the goals of financial stability, maintaining contact with the Agency, and maintaining a healthy and loving relationship with her children. *Id.* at 57, 80-82, 93. Ms. Amoroso also acknowledged that K.L. was providing urine screens and maintaining a drug-free lifestyle, only testing positive for marijuana with a valid medical marijuana card. N.T., 10/12/22, at 58, 83; *see also* N.T., 3/28/22, at 103, 158, 160; *see also* Petitioner's Exhibit 43 & 58 (urine screen results). However, Ms. Amoroso described a recent referral from September 2022 where J.B. (II) was reported to have ingested a gummy from K.L.'s bag and thereafter tested positive for THC. N.T., 10/12/22, at 50-51, 57.

Furthermore, Ms. Amoroso acknowledged criminal proceedings in both New York and Pennsylvania involving K.L. Ms. Amoroso noted that K.L. entered a written guilty plea in July 2022 and was awaiting sentencing, as her case was "tracking" with Father's as a cooperating witness, in Pennsylvania.[16]

---

[16] Ms. Amoroso confirmed K.L. was compliant with parole in New York and with the conditions of pretrial release in Pennsylvania. *Id.* at 74, 77.

N.T., 10/12/22, at 54-55, 73-74. Further, K.L. pleaded guilty and, in March 2022, was sentenced to five years' probation in New York. *Id.* at 55-56, 75-76. However, Ms. Amoroso stated that the transfer of K.L.'s probation to Pennsylvania was denied as her housing was not approved. As such, K.L. was required to reside in New York and was residing with a family friend at an address provided by K.L.'s probation officer. *Id.* at 41-42, 56, 59, 77-78, 80-81. Ms. Amoroso testified that, despite inquiry, K.L. did not provide any information regarding this residence in New York.[17] *Id.* at 56-57, 59, 77, 92-93.

Finally, Father had criminal matters pending in Pennsylvania and New York and remained incarcerated in New York. *Id.* at 59-60. Given his incarceration, Ms. Amoroso acknowledged that Father was unable to attain his goals of maintaining housing or financial stability. *Id.* at 60-61, 86.

Significantly, Ms. Amoroso indicated the Children are happy and doing well in foster care. She stated, "[J.B. (II), J.B. (III), and J.B. (IV)] have a significant relationship with their foster parents, and they're doing extremely well and wish to remain in the home." *Id.* at 61. J.B. (II) described a "very strong" relationship with her foster parents and indicated that she would "like to stay in foster care a little bit longer, because I feel like my parents are

---

[17] When questioned on cross-examination regarding an ICPC, Ms. Amoroso explained that it would be the parent's responsibility to request an ICPC and K.L. never requested one. *Id.* at 81-82, 92.

maturing up a little bit." ***Id.*** at 28, 31. Further, while confirming J.B. (I)'s desire to reside with his mother, ***id.*** at 66, Ms. Amoroso indicated that J.B. (I) "reports being very happy and content" in his current foster home, ***id.*** at 62.

Based on the foregoing, we hold that the juvenile court abused its discretion in denying the Agency's petition for a goal change. After 37 months, Parents had yet to satisfy their established goals toward reunification. Father remained incarcerated. While L.G. and K.L. made some progress, housing remained a significant issue for both women. Furthermore, K.L. remained on long-term probation in New York and awaited sentencing in Pennsylvania. As indicated, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." ***N.C.***, 909 A.2d at 824. The Children are all in pre-adoptive homes where they are happy and doing well. Accordingly, as the Children are entitled to permanency and stability, the juvenile court erred in failing to recognize it is in their best interests for their permanency goals to be changed to adoption.

For the foregoing reasons, we reverse. We remand to the juvenile court for orders changing the Children's permanency goals to adoption.

Orders reversed. Cases remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/9/2023