J-A11010-24

2024 PA Super 144

| IN THE INTEREST OF: K.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 100 MDA 2024 |

Appeal from the Order Entered December 27, 2023
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000082-2019

BEFORE: BOWES, J., STABILE, J., and MURRAY, J.

OPINION BY BOWES, J.:                     **FILED: JULY 15, 2024**

K.C. ("Mother") appeals from the December 27, 2023 order changing the permanent placement goal for her minor daughter, K.C., from a primary goal of reunification and a concurrent goal of adoption, to a primary goal of adoption and a concurrent goal of reunification. We affirm.

We glean the following from the certified record. The York County Office of Children, Youth & Families ("CYF") has been involved with Mother since she was adjudicated dependent in 2015. K.C. was born in August 2017, while Mother remained in foster care. Mother engaged Pressley Ridge, which provides family service programming, to improve her parenting skills at that time. In April 2019, K.C. was adjudicated dependent and removed from Mother's foster home. However, by early 2020, K.C. returned to Mother's care and was no longer considered dependent, thereby ending court supervision. K.C.'s father, K.C. ("Father"), exercised supervised partial physical custody.

In October 2022, CYF again sought and was granted an emergency petition for protective custody for K.C. Of concern to the agency, Mother became incarcerated in September and, after she left K.C. in Father's care, there were allegations of physical abuse perpetrated by Father against K.C.[1] Ultimately, K.C. was again adjudicated dependent, placed in kinship care with her maternal aunt, C.O. ("Foster Mother"), and set with a goal of reunification with her parents. K.C. was engaged with a therapist, Kim Sanders, to address K.C.'s ADHD diagnosis, her struggles with managing her trauma and stress responses, and to provide neurofeedback during sessions.

Following a permanency review hearing on April 11, 2023, a concurrent goal of adoption was added.[2] The concurrent goals remained the same

_____

[1] The court subsequently made a finding of abuse as to Father. At the time of the disputed goal change, Father had not been in contact with CYF and did not attend the December 2023 review hearing.

[2] It is considered a best practice in dependency cases for the court to implement concurrent planning:

> In all cases where children are removed from the home, the agency is required to implement concurrent planning. Concurrent planning is the practice whereby the agency simultaneously establishes and executes one permanency goal along with a concurrent plan for the child. If for any reason the permanency goal does not work out for the child, the concurrent plan can be immediately effectuated. Concurrent planning can significantly shorten the length of time a child remains in care since virtually no time is lost in shifting from the initial permanency plan to the concurrent plan.

Pennsylvania Dependency Benchbook, 3rd Edition (2019) ("Dependency Benchbook"), at 10.5. In practice, courts are encouraged "to emphasize to
*(Footnote Continued Next Page)*

following the next two hearings, but the court warned at the September 2023 review hearing that "[i]f there [wa]s not sufficient progress toward this goal or reunification [wa]s not imminent by the next hearing, the [c]ourt may change the goal from reunification to a more appropriate goal." Permanency Review Order, 9/28/23, at 3.

The next review hearing was held on December 27, 2023. K.C., who was six years old and represented by a guardian *ad litem* ("GAL"), had by that time been adjudicated dependent for over fourteen months. Mother consistently had supervised visits with K.C. twice a week through Catholic Charities, as well as weekly therapeutic visits supervised by Pressley Ridge. As to K.C.'s trauma, Ms. Sanders, testified that "[K.C.] still has a lot of improvements to make" to "build coping strategies" for "her trauma and stressors" and to "increase positive ways to express herself." N.T. Status Review Hearing, 12/27/23, at 5-6. As of the hearing, K.C. had demonstrated an ability to regulate her emotions and behavior approximately half of the time. *Id*. at 6. Significantly, Catholic Charities indicated that before moving to partially supervised visits, both Mother and K.C. must make more progress in their individual therapy programs to be able to "talk through more of these . . . big feelings that [K.C.]'s having[.]" *Id*. at 30-31.

_____

the parties that the establishment of the concurrent plan does not in any way mean that the goal of reunification will not be seriously pursued." *Id*. at 13.6.5. Rather, it is expected that "[i]n some cases, knowing that there is a "Plan B" so to speak, will cause parents to work harder towards achieving their goals." *Id*.

Foster Mother expressed concerns about reunification. She worried that K.C. would be reunited with Mother only to inevitably be removed again at some point in the future because, in her view, Mother had "made almost no progress" and supervision of visits had "gone backwards." *Id*. at 18-19, 22. CYF, for its part, opined that while Mother had been compliant with their requests, her progress had plateaued. *Id*. at 39-40, 44. Both the GAL and CYF recommended keeping the status quo, while Mother sought increased visitation. *Id*. at 40-43. When questioned regarding the length of K.C.'s dependency, however, the GAL stated that it "would lean toward changing the goal because of the timing involved here, not because of any negatives towards [M]other at this point, and also the fact that we're stagnant with general progress at this time." *Id*. at 44.

Focusing on the duration of the dependency, the trial court acknowledged Mother's progress but determined that K.C. is "six, and it just seems . . . that the child is at a point in her life where she needs permanency. She needs to know where she's going to be living the rest of her childhood[.]" *Id*. at 45. Accordingly, the court changed K.C.'s primary goal to adoption and her concurrent goal to reunification.[3] *Id*.; *see also* Status Review Order, 12/27/23, at 1-2.

---

[3] When a primary permanency goal of reunification is changed to adoption, but reunification "remains the concurrent plan, the agency must continue to offer services and make reasonable efforts to reunify." Dependency Benchbook at 14.5.

This timely appeal followed. Mother included a concise statement of errors with her notice of appeal and the trial court issued a responsive Rule 1925(a) opinion, which directed us in large part to the reasons stated on the record at the conclusion of the December review hearing.[4] Mother raises the following issues for our consideration:

1. Whether the lower court abused its discretion and err[ed] as a matter of law when it unreasonably changed the goal from reunification to adoption despite the testimony presented of regular and consistent progress made by Mother.

2. Whether the lower court abused its discretion and err[ed] as a matter of law when it changed the court ordered goal from reunification to adoption without clear and convincing evidence that a change of goal would serve the best interests of the child.[5]

Mother's brief at 4 (capitalization altered, numbering added).

This Court reviews goal-change orders for an abuse of discretion. *See Interest of J.B.*, 296 A.3d 1234, 1238 (Pa.Super. 2023). When conducting this evaluation, we "accept the findings of fact and credibility determinations

---

[4] Both GAL and CYF submitted letters in lieu of briefs, expressing their continued support for a primary goal of reunification and a concurrent goal of adoption. *See* GAL Letter, 3/26/24 (noting that Mother has made progress while this case was pending); CYF Letter, 3/26/24, at unnumbered 1-2 (indicating that it "has not changed its position").

[5] Mother states in this section of her argument that termination of her parental rights as to K.C. was improper. *See* Mother's brief at 24. We note that the only order before us is a goal change order, not a termination order, and that as of the filing of this notice of appeal, Mother's parental rights had not been terminated and her concurrent goal remained reunification.

of the trial court if they are supported by the record[.]" *Id*. (citation omitted).

We have explained our deferential examination in this regard:

> Not only are our trial judges observing the parties during the hearing, but usually . . . they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court.

*Id*. (cleaned up). We are not bound by the trial court's legal conclusions. *Id*.

Placement goals are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301-65. "[Section] 6351 of the Juvenile Act directs that a juvenile court not only consider the appropriateness and feasibility of a child's current goal during the permanency review hearings, it also mandates that the court enter an order addressing whether to continue, modify or terminate placement." *In Int. of L.T.*, 158 A.3d 1266, 1278 (Pa.Super. 2017) (citation omitted). Thus, a goal change may occur as a result of a petition by the responsible agency, or *sua sponte* by the trial court during its mandatory review of the dependency matter. *Id*. Regardless of the starting point, we have outlined the analysis a trial court must undertake when modifying a child's permanent placement goal as follows:

> The policy underlying the[ Juvenile Act] is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, . . . the focus of

dependency proceedings, including change of goal proceedings, [is] on the child. Safety, permanency, and well-being of the child must take precedence over **all** other considerations, including the rights of the parents.

Pursuant to 42 Pa.C.S. § 6351(f) of the Juvenile Act, when considering . . . a goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court.

*Int. of J.B.*, 296 A.3d at 1238–39 (cleaned up, emphasis in original).

Additionally, the court must determine "[w]hether reasonable efforts were made to finalize the permanency plan in effect" and whether the current caregiver is providing the child "with regular, ongoing opportunities to participate in age-appropriate or developmentally appropriate activities." 42 Pa.C.S. § 6351(f)(5.1), (12). Although we have held that "parental progress toward completion of a permanency plan is an important factor, it is not to be elevated to determinative status, to the exclusion of all other factors." *Int. of J.B.*, 296 A.3d at 1239 (cleaned up). Ultimately, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *Id*. (cleaned up).

Although Mother raises two issues, both challenge the trial court's decision to change K.C.'s permanency goal. She claims the trial court erred

in swapping the priority of K.C.'s placement goals because Mother had complied with all the service plans and the change was not in K.C.'s best interests. Mother maintains that placement is no longer necessary as she has progressed towards reunification, which she deems feasible within twenty-two months. Additionally, she notes a lack of safety concerns relating to Mother, and the fact that K.C. had not yet been in placement for fifteen months at the time of the hearing. *See* Mother's brief at 17-22.

According to Mother, the only impediment to less supervision during visits is K.C.'s behavior and her continued need to address her trauma responses in therapy. In other words, the stagnation in progress is not Mother's fault because K.C.'s therapy "can't be rushed and can only go at the pace that the child dictates by ability to control her behaviors." *Id*. at 18-19.[6]

Finally, she argues that there was insufficient evidence to establish that the goal change would benefit K.C. since "it would sever the strong bond Mother had with [her]." *Id*. at 25. In sum, Mother believes that she "is

---

[6] Mother also contends that the trial court exhibited bias by attributing a non-existent custody order violation to Mother. *See* Mother's brief at 22. Her brief does not cite to where in the record this bias is demonstrated, nor does it explain the alleged violation. As best we can discern, the GAL indicated at the adjudicatory hearing that Mother violated a custody order when she left K.C. in Father's care upon her incarceration. *See* N.T. Adjudicatory Hearing, 10/28/22, at 25. Mother's counsel subsequently contested the existence of any such order. *See* N.T. Finding of Abuse Hearing, 1/24/23, at 38-39. Regardless of whether such an order existed, we discern no bias on the court's part or reliance on this purported violation in rendering the underlying goal change order.

entitled to more time since she has made continual and consistent progress with her court[-]ordered goals." *Id*. at 22.

The trial court acknowledged Mother's progress but placed greater weight on the inability of CYF or the GAL to recommend increased visits or less supervision during visits after fourteen months of dependency. *See* Trial Court Opinion, 2/7/24, at 3. In changing the priority of the goals, the court emphasized that it was "not too late for progress" and it was "not giving up on [Mother]. The concurrent goal is still reunification, but we [have] to go a different direction because the child needs permanency." N.T. Status Review Hearing, 12/27/23, at 48. It elucidated:

> Fortunately or unfortunately, whatever the case may be, I had this case back in 2019 also, and I sort of cringed when [Foster Mother] said that this is the second time and she doesn't want to see a third or a fourth because there's just a little bit of truth to that.

> This child is six, and it just seems to me that the child is at a point in her life where she needs permanency. She needs to know where she's going to be living the rest of her childhood, so I'm going to change the primary goal to adoption and secondary or concurrent goal to reunification effective immediately.

> Like [GAL], I do have some reluctance. Mother has been making some progress, very commendable in job and housing, I just don't think K.C. can wait forever.

*Id*. at 45 (cleaned up).

Our review of the certified record confirms that the evidence could sustain either outcome. Certainly, Mother's compliance with her goals and consistency with visits could have supported maintaining reunification as the

primary objective. However, the record also bears out the trial court's conclusion that a goal change was appropriate because K.C. had been dependent for over fourteen months, reunification was not imminent, visits had not and would not in the near future progress beyond supervised, and K.C. needed permanency. *Cf. In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (concluding that while "the record could have supported a goal change to adopting" because the child had been removed two years earlier and the parents had not attained their goals, the record also supported the court's decision to deny a goal change because the parents had been successfully endeavoring to attain their goals and had positive interactions with the child, whereas there were concerns with the foster parents).

Indeed, this "case epitomizes why appellate courts must employ an abuse of discretion standard of review, as we are not in a position to make the close calls based on fact-specific determinations." *Id*. Rather, we defer to the trial court, which observes the parties firsthand, is able to ascertain credibility, and, based on those findings, can "gauge the likelihood of the success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court." *Id*.

We note that this Court wholly approves of the trial court's use of concurrent planning in this case, as it "both protects the child from foster care drift, by allowing agencies to consider adoptive resources (including kinship

- 10 -

care) while keeping alive the potential of reunification." *Id*. at 1191 (citation omitted). Under such a plan, Mother may still progress towards reunification, while ensuring that K.C. has a permanency plan with Foster Mother if reunification proves impractical or not in K.C.'s best interest. In that regard, we hope that GAL's referenced improvements on Mother's part continue. At this juncture, though, the record supports the trial court's conclusion that a primary goal of adoption was in the best interests of K.C. Accordingly, we affirm the order of the trial court changing the primary goal of reunification and concurrent goal of adoption to a primary goal of adoption and concurrent goal of reunification.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 07/15/2024