J-A27031-25

2026 PA Super 33

| IN THE INTEREST OF: M.K.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: PHILADELPHIA DEPARTMENT OF HUMAN SERVICES | : | |
| | : | |
| | : | |
| | : | No. 947 EDA 2025 |

Appeal from the Order Entered April 10, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000061-2025

| IN THE INTEREST OF: M.A.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: PHILADELPHIA DEPARTMENT OF HUMAN SERVICES | : | |
| | : | |
| | : | |
| | : | No. 948 EDA 2025 |

Appeal from the Order Entered April 10, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000062-2025

BEFORE:  BOWES, J., MURRAY, J., and BECK, J.

CONCURRING OPINION BY BOWES, J.:          **FILED FEBRUARY 24, 2026**

Constrained as we are by our Supreme Court's precedent, I agree with my esteemed colleagues' decision to vacate the orders denying DHS's petitions to terminate Mother's parental rights to her five-year-old sons, M.K.L. and M.A.L. ("Children"), pursuant to 23 Pa.C.S. § 2511(a)(8) and (b). However, for the reasons discussed *infra*, I write separately to stress my

position that where, as here, the certified record reveals that there is only one reasonable ultimate outcome of the termination proceedings, delaying the inevitable is contrary to the involved children's best interests and the goals of the Juvenile Act.

In outlining the reasons for its disposition, the Majority concludes that the trial court erred both by (1) failing to conduct the bifurcated legal analysis required by § 2511, *see* Majority Opinion, at 34-35, 39; and (2) misapplying the law in relation to the second prong of § 2511(a)(8) to determine that DHS failed to establish that the conditions that led to the Children's removal no longer existed. ***Id***. at 48 ("Applied to the correct legal standard under subsection (a)(8), the juvenile court's findings, at best, indicate that Mother has made some progress toward eliminating the conditions."); *see also **In re I.J.***, 972 A.2d at 11 (providing our inquiry is focused upon whether predicate conditions have been "remedied" such that "reunification of parent and child is imminent at the time of the hearing").

Considering the foregoing errors, DHS requests that we reverse the trial court order and terminate Mother's parental rights. ***See*** DHS brief at 51 ("Reversal is necessary to protect [the Children's] right to stability, security, and emotional well-being."). The Child Advocate also supports reversal in anticipation of adoption. ***See*** Children's brief at 33 ("[T]he Child Advocate respectfully requests that this Court reverse the trial court's decision and terminate the parental rights of Mother and allow the children to achieve

permanence in the safe and nurturing home of their Grandmother.")[1] However, relying upon our High Court's prior admonishments in *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021), and *Interest of K.T*., 296 A.3d 1085, 1117 (Pa. 2023) (quoting *S.K.L.R.* (appellate courts "are not in a position to make the close calls based on fact-specific determinations")), the Majority declines the invitation to reverse the trial court's order denying termination. *See* Majority Opinion at 54.

I find no fault with the Majority's measured course of action in refusing to do so. Nevertheless, it is the opinion of this jurist that delaying permanency in these dependency-related involuntary termination cases by remanding for further proceedings, in the face of reversible error, undermines the stated "'goal of finding permanency for children in less than two years, absent compelling reasons,' in accordance with federal law." *Interest of K.T.*, 296 A.3d at 1108 (quoting *In re T.S.M.*, 71 A.3d 251, 269 (Pa. 2013) ("Following [the Adoption and Safe Families Act of 1997 ("ASFA")], Pennsylvania adopted the goal of finding permanency for children in less than two years[.]")) (cleaned up); *see also* 42 U.S.C. § 675(5)(E) (delineating procedure to assure that participating agencies proceed with termination when children have been in foster care for fifteen of the most recent twenty-two months);

_____

[1] Remanding these cases for what amounts to a do-over vitiates this advocacy for prompt finality.

42 Pa.C.S. § 6351(f)(9) (implementing ASFA consideration in permanency review hearings).

From my perspective, it is critical to advance the Children's interest in permanency because of the fleeting nature of childhood. As the **K.T.** Court explained:

> Our unanimous decision in **T.S.M.** also highlighted the importance of permanency and the need to find stability for dependent children in a timely fashion. As then-Justice Baer stated so eloquently, courts considering a termination petition "must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development **quickly**." *Id*. at 269 (emphasis added).

*Interest of K.T.*, 296 A.3d at 1107–08 (Pa. 2023).

Mindful that permanence is near to paramount, and considering the inevitable outcome of this case, on a clean slate I would have simply acknowledged the trial court's procedurally-flawed legal analysis and directed it to grant the petition to terminate Mother's parental rights to facilitate Children's adoption by S.K., the Paternal Grandmother. Where, as here, the underlying facts plainly support the termination of parental rights, reversal avoids the unnecessary delays to permanency associated with remanding for further proceedings, which, as the **K.T.** Court noted, may include allowing the trial court to further develop the record.

As this case is exemplary of what I consider a manifestly unreasonable decision calling for reversal, I summarize the following facts as applied to the appropriate legal analysis. DHS removed Children from Mother's care based

- 4 -

upon allegations that she abused M.K.L. physically, resulting in a black eye and facial lacerations. *See* N.T., 3/13/25 at 11. The allegation of abuse was determined to be founded. *Id*. 13 ("The [c]ourt's going to take judicial notice that the Court found [Mother] as a perpetrator of child abuse at the last listing as to M.K.L."). Hence, concerns about Mother's anger management and mental health problems have permeated this case from the outset.

During the termination hearing, Mother's aggression emerged as she persistently interrupted the testimony of Sheena Lowe, the CUA case manager assigned to the Children. Mother provided a running commentary of Ms. Lowe's testimony, interrupted the proceedings seventy times, and engaged in several profanity-laced emotional outbursts. At one point, Mother so heatedly protested Ms. Lowe's testimony, speaking over counsel, the trial court, and the security officer, that the court instructed the Sherrif's Office to escort Mother from the courtroom. The following excerpt underscores the tirade that preceded Mother's ejection:

> **MS. LOWE**: There were additional issues concerning [Mother's] home, that it was a lot of clutter, and the home was in a state of disarray and there wasn't any food in the refrigerator and very little food in the cabinets.
>
> **THE MOTHER**: Oh my god.
>
> . . . .
>
> **THE MOTHER**: That's fucking retarded. Like –
>
> **MS. LOWE**: That was from my review of the record.
>
> **THE COURT**: Okay.

**THE MOTHER**: Oh my gosh.

. . . .

**THE MOTHER**: Like this is unfair because that's not even true.

**THE COURT**: Okay.

**THE MOTHER**: Like this is retarded.  Like you all just saying anything.

. . . .

**THE MOTHER**: No, because now they're just saying  anything.

**COURT OFFICER**: Stop screaming out.

**THE COURT**: [Mother], you got to –

**THE MOTHER**: Like that's not even true.  Like I'll -- I'll tell you if that's true.  Like that's really retarded.

**THE COURT**: Okay.

**THE MOTHER**: Like she's just saying anything.  That wasn't even in the report originally.  I had safety hazards.  Fucking radiators weren't covered, stuff like that. What do you mean no food in the cabinets and stuff?  Like oh my gosh.

. . . .

**THE COURT**: All right, [Mother].  You're going to have your opportunity, [Mother].  Go ahead, [DHS Counsel].

[**DHS Counsel**]: Thank you, Your Honor.

**BY [DHS Counsel]**:

**Q**. Do you have concerns that [M]other is or was using substances at any point?

**A**. Yes.

**Q**. Can you elaborate on why you have those concerns?

- 6 -

**A**. I have those concerns based off of –

    . . . .

**THE MOTHER**: This is crazy.  They just want to terminate.  You all just want to terminate me at this point.

**THE COURT**: [Mother], that's enough, [Mother].

**THE MOTHER**: Like this is retarded.  They're going to do it anyway.  It's okay.  This is you all world.

    . . . .

**THE MOTHER**: That's it.  That's -- this is retarded.  I've never been around you using any substance.  Are you -- are you serious?

    . . . .

**THE MOTHER**: You're really trying to terminate me right now[?]

[**MOTHER'S COUNSEL**]: Let me do the objecting.

**THE MOTHER**: She just -- like she just literally -- that's false.

    . . . .

**THE MOTHER**: That is so false.

    . . . .

**THE MOTHER**: Oh my god.  Like this is what I'm talking about.

    . . . .

**THE MOTHER**: Like, ma'am, you're just saying anything on that stand, and you are lying. You are lying. You know you are.  How can she do that, yo.  How could she do that.  She know damn well that's a lie.  Oh my god.  Ma'am.

**THE COURT**: Okay.  Let the record reflect it is now 2:49:32, [M]other has left the courtroom because [M]other had another outburst.  She was escorted out by the sheriffs.  She's permitted back in if and when she can resume proper court behavior.

N.T., 3/15/25, at 16-20.

Even after Mother ostensibly regained her composure and returned to the hearing, she eventually resumed berating Ms. Lowe about her testimony:

**BY** [**DHS COUNSEL**]:

**Q**. Have you witnessed the boys initiating any affection towards their mother?

**A**. No.

**Q**. Okay.  And have you witnessed the boys –

**THE MOTHER**: This lady --You're a bitch.  That's what you are.

**COURT OFFICER**: Ma'am, ma'am.

**THE MOTHER**: No, she's a bitch.  Yeah, that's on the record, yeah.

**COURT OFFICER**: (inaudible)

**THE MOTHER**: You all can terminate, do whatever you want.

**COURT OFFICER**: Ma'am, ma'am, calm down.

**THE MOTHER**: That's -- that's some bullshit, my boys don't show me no affection[?]  They don't say mommy and all of that[?]  I love you, none of that, right?  This is retarded.  Let's just get through it. Let's go. Come on.  I really don't care at this point.  I really don't.  I gave it my fucking all.  And for her to just sit up there like I've been just sitting back as a mom, not doing nothing is  just really retarded, down to the fact that my boys don't even love me or show me affection.  Down to the part where do they show -- no, they don't.  You all, like this is --this is cruel.  This is so freaking harsh.  Like this is crazy, but okay.

        . . . .

**THE MOTHER**: Oh my gosh.

**COURT OFFICER**: Calm down.

. . . .

> **THE MOTHER**: My heart is hurt and I can't keep doing this. This is my last court date, I swear to god. I gave it my all. I cannot see this lady again or any – I don't care what happens. I just got to – I got to get out of this. Oh my god, oh my god, oh my god. I try. Oh my god, oh my god. Oh my god.

*Id*. at 39-40.

Mother's belligerence highlights the fact that her mental health problems and chronic inability to manage her anger persist, notwithstanding the trial court's finding that DHS did not establish that Mother failed to address the conditions that led to the Children's removal. Indeed, the court's orders entered from the bench following the hearing soundly refute this would-be finding that Mother had, in fact, addressed these conditions. As to Mother's problems with her mental health and anger management, the court ordered, "Mom is to continue with mental health treatment at JFK. . . . Mom is to attend anger management. Mom's visits are weekly supervised at the agency, line of sight, line of hearing." N.T., 3/15/25, at 59.

As noted by the Majority, the trial court's orders "strongly suggest that . . . the juvenile court believed that Mother had not remedied the conditions that led to Children's removal." Majority Opinion at 49. Hence, the trial court's finding of fact is not supported by the record, and insofar as the certified record demonstrates that DHS established the second prong of § 2511(a)(8) by clear and convincing evidence, the trial court committed reversible error in denying relief on that basis. Thus, but for being constrained

to remand these cases, I would see no reason for the court to revisit this prong.

Finally, while the needs-and-welfare analysis required by the third prong of § 2511(a)(8) is legally distinct from its particularized counterpart outlined in § 2511(b), insofar as the latter expressly concerns the child's developmental, physical, and emotional needs and welfare, like the trial court and Majority, I address these analyses collectively. *See* Majority Opinion at 57 (referencing both § 2511 (a)(8) and § 2511 (b) in stating that the needs and welfare analysis shall be in accordance with *K.T.*).

Our Supreme Court delineated this inquiry as follows:

[C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d at 1105-06 (cleaned up).

- 10 -

The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (cleaned up). It is the trial court's province to "consider the totality of the circumstances when performing a needs and welfare analysis." *Interest of M.E.*, 283 A.3d 820, 839 (Pa.Super. 2022). This Court has clarified that it is "within the discretion of the [trial] court to prioritize the safety and security" of children "over their bonds with their parents." *Id*. We will not disturb such an assessment if the trial court's factual findings are supported by the record. *Id*.

Instantly, the trial court proffered from the bench the following rationale for denying the petition to terminate Mother's parental rights:

> The [c]ourt found that [the] testimony today was lacking in specifics as to mother's shortcomings. The [c]ourt found that [it] . . . is unable to clearly and convincingly decide that . . . [M]other's rights should be terminated based on the evidence that I have in front of me today. That coupled with the testimony that mom shares a healthy strong bond with the children leads me to the only conclusion that the Court can come to is . . . to deny DHS'[s] petition.

N.T., 3/15/25, at 66-67.

Relative to the Children's needs and welfare, the trial court expanded its rationale in the Rule 1925(a) Opinion as follows:

> Ms. Lowe described Mother's visits with the Children as what the [c]ourt interpreted to be appropriate and positive experiences for everyone. She stated that Mother brings snacks and toys for the [C]hildren, and that she interacts with them properly. There was no testimony elicited that showed that Ms. Lowe or any other CUA visitation personnel ever had to redirect or coach [M]other during her time with the Children. Ms. Lowe stated that

- 11 -

sometimes Mother and the Children sang nursery rhymes together and that Mother initiated affection with the [C]hildren by kissing and hugging them in an appropriate manner. (N.T. March 13, 2025, Volume 1, Page 35 to 37). Notably, she testified that Mother and the [C]hildren enjoy a healthy bond. (N.T. March 13, 2025, Volume 1, Page 46).

Ms. Lowe testified that the Children share a close relationship with the current caregiver and that they are bonded. She noted that the caregiver provides a safe, loving, healthy relationship for the [C]hildren and that the caregiver ensures the children attend the services they need. She stated that she believes that the Children would suffer harm if they were removed from the home of the current caregiver. She also said that she believed there would be no irreparable harm to the Children if Mother's parental rights were terminated. (N.T. March 13, 2025, Volume 1, Page 42 to 44).

Trial Court Opinion, 5/30/25, at 5-6.

Without rejecting Ms. Lowe's testimony, the trial court proceeded to criticize the manner in which DHS presented its case, discussed Mother's efforts to comply with her SCP objectives, and ultimately found "DHS failed to meet its burden of proof, making it unclear to this court whether termination of [M]other's parental rights were in the child[ren]'s best interests." *Id*. at 7.

Considering the evidence presented during the hearing, the trial court's needs-and-welfare analysis is flawed. First and foremost, the record does not sustain the purported existence of a strong or beneficial parent-child bond between Mother and Children that is worth preserving. Ms. Lowe never characterized Mother's connection to the children as a parental bond, and the trial court's rationale impermissibly equates Ms. Lowe's actual testimony concerning a "healthy bond" to the "necessary and beneficial" parent-child

bond that is the fundamental concern under the needs and welfare analysis. It is not. We have explained that a parental bond requires more than a casual relationship. *See In re J.L.C.*, 837 A.2d 1247, 1249 (Pa.Super. 2003) ("Children often know, love, and sometimes have an enjoyable time with parents who have little to do with their upbringing[.] The key is whether a bond has developed.").

Here, there is no evidence of Mother's parental bond. Even accepting the trial court's findings that the visits went as Mother described, we may still reject the court's inference that the bond is meaningful. *See In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021) (providing our "standard of review . . . does not require the appellate court to accept the lower court's inferences or conclusions of law."). The testimony that the trial court relies upon merely characterizes a relationship in which Mother is affectionate toward the Children.

However, Mother's affection for her Children is not dispositive. As DHS accurately observes, "expressions of affection such as hugging and singing, while positive, do not, standing alone, demonstrate the existence of a true parental bond. Rather, they reflect a limited, recreational dynamic that lacks the hallmarks of parental responsibility." DHS brief at 48. Stated plainly, the positive affection that Mother displayed toward her sons throughout two years of supervised "line-of-sight-and-hearing" visitations, does not constitute a necessary and beneficial parental bond which "would predictably cause

extreme emotional consequences or significant, irreparable harm" to the Children if severed. *See Interest of K.T.*, 296 A.3d at 1109-10 (explaining that "severance of a necessary and beneficial relationship is the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm"). Even under the trial court's restrictive supervision, Mother's interactions with her sons during visits cannot be interpreted as anything beyond appropriate.

Furthermore, the court's analysis ignored its findings that the Children are closely bonded with Paternal Grandmother, whom the court acknowledges provides a safe, loving, healthy relationship for the Children, and satisfies their needs, including their speech, occupational, and physical therapy services. Indeed, the Children, both of whom are essentially non-verbal, have thrived in the care of Paternal Grandmother, with whom they have shared a parent-child relationship, for what is now three years, more than one-half of their lives. Critically, notwithstanding the trial court's emphasis on the Children's genial relationship with Mother, the certified record supports no inference other than that they would be harmed if removed from their pre-adoptive home with Paternal Grandmother. *See* N.T., 3/15/25, at 43.

Hence, I believe that it is manifestly unreasonable for the trial court to have found that DHS failed to meet its burden as to the termination of Mother's parental rights. Mother's feelings of affection for the Children do not preclude the termination of her parental rights. As of the date of the hearing, the

- 14 -

Children had been placed with Paternal Grandmother for approximately twenty-six months and they are entitled to the safety, security, permanency, and stability that she provides as a pre-adoptive resource. Manifestly, viewed from the Children's perspective and mindful of their specific needs, terminating Mother's parental rights supports their developmental, physical, and emotional welfare. The trial court's recitation of Ms. Lowe's testimony confirms as much and DHS was not required to present expert testimony or a bonding evaluation under the facts of this case. *See In re D.L.B.*, 166 A.3d 322, 328 (Pa.Super. 2017) ("[W]hen evaluating a parental bond, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well." (cleaned up)).

Overall, it is clear to this jurist that delaying the permanency of M.K.L. and M.A.L. in order for the trial court to revisit Mother's progress toward managing her anger and remedying her mental health problems simply prolongs the inevitable, while depriving the children of their sought-after permanency, and placing them at risk of harm. This reality is evinced both by Mother's shocking manifestation of her inability to overcome her anger issues during the termination hearing and the continued need for line-of-sight-and-hearing supervision during her weekly visits with the Children.

Fundamentally, I respectfully disagree with the core idea that appellate courts should extend a special deference toward trial courts in terminating parental rights that we do not extend to those courts in other matters that

focus on the best interest of children. ***See e.g.***, ***Interest of K.B.***, 331 A.3d 50, 58 (Pa.Super. 2025) (reversing denial of dependency petition and directing the court to adjudicate the child dependent); ***Interest of J.B.***, 296 A.3d 1234, 1242 (Pa.Super. 2023) (reversing juvenile court's denial of petitions for goal change and remanding for juvenile court to change permanency goals to adoption); ***Rogowski v. Kirven***, 291 A.3d 50, 60-61 (Pa.Super. 2023) ("Ultimately, [in child custody cases] the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record.").

Rather than unnecessarily prolonging the Children's deprivation of permanency in this case, but for the trial court's flawed analysis in the first instance, I would reverse, as manifestly unreasonable, the orders denying DHS's petitions to involuntarily terminate Mother's parental rights to the Children notwithstanding the apprehensions our Supreme Court noted in ***S.K.L.R.***, and ***K.T.*** ***See e.g.***, ***Interest of K.H.***, 324 A.3d 1222, 2024 WL 3373094 (Pa.Super. 2024) (non-precedential decision) ("We reverse the trial court's order denying termination of Father's parental rights [because] remand for further proceedings is not necessary." (citing ***Hanna v. Key Computer Sys., Inc.***, 562 A.2d 327, 329 (Pa.Super. 1989) ("We have not . . . simply engaged in the substitution of our judgment for that of the trial court. Rather, we have a deep and serious difference of opinion with the trial court as to the effect of the application of the law to the facts of the case[.]")).

Accordingly, while I agree that binding precedent directs us to remand the instant cases for the trial court to perform a proper analysis of § 2511(a)(8) and § 2511(b), mechanically remanding agency-initiated termination of parental rights cases in the face of reversible error and the fleeting stage of childhood is, in my view, contrary to the Juvenile Act's stated objective to expediently achieve permanency for dependent children. ***See Interest of K.T.***, 296 A.3d at 1108 42; ***In re T.S.M.***, 71 A.3d at 269; 42 Pa.C.S. § 6351(f)(9).