J-S15001-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: W.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: B.P.-G., MOTHER | : | |
| | : | |
| | : | No. 67 WDA 2025 |

Appeal from the Order Entered December 12, 2024
In the Court of Common Pleas of Cambria County Children and Youth
Services at No(s):  CP-11-DP-0000056-2023

BEFORE:   OLSON, J., SULLIVAN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY OLSON, J.:                    **FILED:  June 4, 2025**

Appellant, B.P.-G., ("Mother") appeals from the December 12, 2024 permanency review order entered in the Court of Common Pleas of Cambria County that changed the permanent placement goal for W.G., a male child born in February 2022, ("the Child") from one of reunification to one of adoption.[1]  We affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] "[A]n order granting or denying a goal change in a dependency proceeding is [an] appealable [order.]"  ***Interest of J.B.***, 296 A.3d 1234, 1236 n.1 (Pa. Super. 2023).  Mother filed her notice of appeal on January 9, 2025.  The notice of appeal did not contain a concise statement of errors complained of on appeal as required by Pennsylvania Rules of Appellate Procedure 905(a)(2) and 1925(a)(2)(i).  *See* Pa.R.A.P. 905(a)(2) (stating that, "[i]f the appeal is a children's fast track appeal, a concise statement of errors complained of on appeal as described in [Rule] 1925(a)(2) shall be filed with the notice of appeal and served on the trial [court]"); ***see also*** Pa.R.A.P. 1925(a)(2)(i) (stating, "[t]he concise statement of errors complained of on appeal shall be filed and

The trial court summarized the factual history as follows:

> On July 18, 2023, [the Child] was placed in the protective custody of the Cambria County [Children and Youth Services ("CYS")] after Mother and [Father] were arrested by the Pennsylvania State Police in Indiana County[, Pennsylvania] on charges of homicide.[2] According to the shelter care application filed on July 19, 2023,] Father [informed CYS] that he had no friends or relatives available to care for the Child[. CYS] was unable to locate alternative caretakers. The Child was removed from the parents' care and placed in the custody of [CYS] by a July 18, 2023[] verbal emergency order [issued by] the trial court. The Child was then

_____

served with the notice of appeal"). The failure to file a concise statement pursuant to Rules 905(a)(2) and 1925(a)(2)(i) results in a defective notice of appeal. *In re K.T.E.L.*, 983 A.2d 745, 747 (Pa. Super. 2009) (stating, "the failure of an appellant in a children's fast track case to file contemporaneously a concise statement with the notice of appeal pursuant to [R]ules 905(a)(2) and 1925(a)(2)[] will result in a defective notice of appeal. The disposition of the defective notice of appeal will then be decided on a case by case basis[.]").

Mother corrected her procedural defect by filing her concise statement on January 27, 2025, and the trial court subsequently filed its Rule 1925(a) opinion on February 7, 2025. As Mother cured her defect promptly, the defect did not impede the trial court's ability to issue its Rule 1925(a) opinion, and there is no discernable prejudice, Mother's misstep did not defeat jurisdiction, and we proceed to address the merits of Mother's appeal. *See Stout v. Universal Underwriters Ins. Co.*, 421 A.2d 1047, 1049 (Pa. 1980) (stating, "[t]he extreme action of dismissal should be imposed by an appellate court sparingly, and clearly would be inappropriate when there has been substantial compliance with the rules and when the moving party has suffered no prejudice").

The biological father, J.G., ("Father") did not appeal the December 12, 2024 order.

[2] According to Mother, her criminal conviction, as well as Father's criminal conviction, stemmed from an incident where "[F]ather shot a co-worker in Cambria [County], placed the body in his vehicle and then picked up [Mother] and [the Child] and drove to Indiana [County, Pennsylvania] where he tossed the body into the woods." Mother's Brief at 9. Mother and Father were subsequently arrested by the Pennsylvania State Police in Indiana County. *Id.*

placed in foster care. On July 20, 2023, the trial court memorialized the verbal order in a written order. On July 26, 2023, after an adjudicatory dependency hearing, the [trial] court ruled that the Child was dependent as he was without proper care or control, subsistence, and education as required by law [because] his parents were [] incarcerated on homicide charges. Mother and Father were ordered to complete parenting skill classes. About 4[ to] 5 months after the Child's placement, Mother requested[, and was granted,] visitation with the Child[, and] once a month, she has supervised video calls with the Child for about [10 minutes.[3]]

On January 17, 2024, [the trial] court held a review hearing and found that the placement of the Child in foster care continued to be necessary and appropriate as both his parents were still incarcerated. The permanency plan and placement goal developed for the Child was reunification with his parents with the concurrent plan of adoption. At the time of [the review] hearing, the Child was in placement for five months. Mother, now incarcerated at the Centre County Prison, completed parenting classes.

. . .

At the time of the July [2024] permanency hearing,[4] Mother had posted bail but was still incarcerated [in] the Centre County Prison. On direct examination by counsel for [CYS], the caseworker for the Child[] stated that Mother was still incarcerated because she did not have a home plan, that "some places thought she would be a high risk for running," and that she had no support system in Pennsylvania as her family [resided] in Louisiana. When asked about the monthly supervised video calls, [the caseworker] said that the Child recognized Mother, would

_____

[3] The CYS caseworker indicated that the video calls between Mother and the Child "last about 10 minutes in duration" and occur monthly. CYS Exhibit 1 (October 23, 2024 Memorandum).

[4] The goal change hearing scheduled to occur in conjunction with the permanency review hearing was continued at the request of Mother's counsel, and without objection, so Mother could have "additional time to establish her ability to parent." Trial Court Opinion, 2/7/25, at 2-3.

interact with her, blow kisses or wave goodbye when prompted, but did not reply with "mom" anymore.

When asked by counsel for [CYS] about how the Child was doing in his foster care placement, [the caseworker] stated[, "the Child] is doing extremely well in the foster home. He would have daily tantrums, head banging, would cry terribly anytime the foster parents would leave his eyesight. They all had to be in the same room when I conducted video calls. [The Child] has successfully graduated all of his early intervention services and he also now has a level of comfort to where I can conduct a video [call] with just myself [and the Child] in the room. The foster parents can be out doing other things and [the Child] feels comfortable."

[The trial] court asked [the caseworker] if [CYS] had additional concerns other than Mother's incarceration[. The caseworker responded that "we would have additional concerns upon release. We would have concerns of the housing, the income, mental health, parenting skills, [and] decision making processes."]

On September 30, 2024, Mother pleaded guilty to abuse of a corpse[, 18 Pa.C.S.A. § 5510,] and [altered, forged or counterfeit documents and plates, 75 Pa.C.S.A. § 7122.] On September 25, 2024, Father pleaded guilty to murder of the third degree[, 18 Pa.C.S.A. § 2502(c).]

. . . On November 13, 2024, [the trial] court held [a] permanency review and goal change hearing. At this point in time, the Child had been in [CYS's] care and placement for 15 of the last 22 months.

Mother and Father had been incarcerated since the time of the placement, and Mother and Father were still awaiting sentencing at the time of the hearing. [CYS] recommended the goal change of adoption based on the Child's need of a permanent and consistent environment.

At the November hearing, counsel for [CYS] asked [the caseworker] how [the Child] was doing in his foster care placement. [The caseworker] stated that [the Child] was "doing very well." When asked if [the Child] was developmentally on target and if his foster home appears to be meeting his needs, she stated "yes" to both questions.

[Mother's counsel] cross-examined [the caseworker] about [CYS's] recommendation of a goal change [as follows]:

| [Mother's Counsel:] | What is [CYS's] reasoning for the change of goal or why do you believe it's in the best interest of the Child? |
|---|---|
| [CYS Caseworker:] | The Child has been in care for over 15 months.  It would not be in his best interest to continue with the goal of reunification.  [] Mother has not yet been sentenced, and so that just leaves a question of how much longer would he continue to be in [foster] care if [the goal is not changed.] |

Counsel for CYS cross-examined Mother about her housing plan upon her release from incarceration [as follows]:

| [CYS Counsel:] | Mother, you indicated that you're going to the Centre Safe domestic violence shelter if you're released? |
|---|---|
| Mother: | Yes. |
| [CYS Counsel:] | Why a domestic violence shelter? |
| Mother: | It's the only resource that's available to me at the moment. |
| [CYS Counsel:] | It's not a long-term housing plan[,] right? |
| Mother: | It's for 30 to 60 days and they offer long-term housing as a result of the shelter.  They have a grant *per se* that will give you housing. |
| [CYS Counsel:] | Are you already accepted into this program? |
| Mother: | Yes. |
| [CYS Counsel:] | And how long do you plan to stay there? |
| Mother: | Until I get into an apartment where they offer the grant money. |

> [CYS Counsel:]       So you don't know?
>
> Mother:             I am not aware of my release date,
> so I'm unsure of all those logistics.
>
> Based on the evidence and testimony presented at the hearing,
> [the trial] court ordered the permanent placement goal be
> changed from reunification to adoption [on December 12, 2024.]

Trial Court Opinion, 2/7/25, at 1-6 (extraneous capitalization and original brackets omitted). This appeal followed.[5]

On appeal, Mother challenges the December 12, 2024 permanency review order on the ground the trial court erred by changing the goal from one of reunification to one of adoption based solely on Mother's incarceration and her inability to parent her child.[6] Mother's Brief at 4, 7-13.

> When we review a trial court's order to change the placement goal
> for a dependent child to adoption, our standard is abuse of
> discretion. In order to conclude that the trial court abused its
> discretion, we must determine that the [trial] court's judgment
> was manifestly unreasonable, that the [trial] court did not apply
> the law, or that the [trial] court's action was a result of partiality,
> prejudice, bias[,] or ill[-]will, as shown by the record. We are
> bound by the trial court's findings of fact that have support in the
> record. The trial court, not the appellate court, is charged with

---

[5] As discussed *supra*, Mother filed her concise statement on January 27, 2025. The trial court filed its Rule 1925(a) opinion on February 7, 2025.

[6] Mother characterizes the December 12, 2024 permanency review order as an order terminating her parental rights to the Child. Mother's Brief at 4 (asking whether, or not, the trial court erred in "terminating the parental rights of [Mother to the Child] by changing the [placement] goal"). The December 12, 2024 order changed the permanency goal for the Child from one of reunification to one of adoption and did not terminate Mother's parental rights. **Interest of H.J.**, 206 A.3d 22, 25 (Pa. Super. 2019) (stating, "[a] placement goal change to [a]doption does not terminate the parents' rights; however, it is a step in that direction").

the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.

*In re N.C.*, 909 A.2d 818, 822-823 (Pa. Super. 2006) (citations and quotation marks omitted). "Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act, [codified at 42 Pa.C.S.A. §§ 6301-6387.]" *N.C.*, 909 A.2d at 823.

> The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, [] the focus of dependency proceedings, including change of goal proceedings, [is] on the child. Safety, permanency, and well-being of the child must take precedence over all other considerations, including the rights of the parents.

*Id.* (citations omitted). "[T]he focus of all dependency proceedings, including goal change proceedings, is on the safety, permanency, and well-being of the child[,] and the best interests of the child must take precedence over all other considerations." *H.J.*, 206 A.3d at 25; *see also N.C.*, 909 A.2d at 823 (stating that, "[m]atters of custody and placement for a dependent child must be decided under the standard of the child's best interests, not those of his or her parents"). "[T]here is no minimum period of time that a child's goal must be set at reunification before it can be changed [because, as courts have long-held] a child's life simply cannot be put on hold in the hope that the

parent will summon the ability to handle the responsibilities of parenting."

***J.B.***, 296 A.3d. at 1239 (citations and original quotation marks omitted).

Section 6351(f) of the Juvenile Act requires that, at each permanency hearing, the trial court shall determine, *inter alia*,

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility[,] and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

. . .

(9) If the child has been in placement for at least 15 of the last 22 months or the [trial] court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian[,] or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process[,] and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental[,] and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian[,] or custodian within the time frames set forth in the permanency plan.

. . .

(12) If the child has been placed with a caregiver, whether the child is being provided with regular, ongoing opportunities to participate in age-appropriate or developmentally appropriate activities. In order to make the determination under this paragraph, the county agency shall document the steps it has taken to ensure that:

(i) the caregiver is following the reasonable and prudent parent standard; and

(ii) the child has regular, ongoing opportunities to engage in age-appropriate or developmentally appropriate activities. The county agency shall consult with the child regarding opportunities to engage in such activities.

42 Pa.C.S.A. § 6351(f)(1-6, 9, 12).

Based upon the determinations made under [Section 6351(f)] and all relevant evidence presented at the hearing, the [trial] court shall determine, *inter alia*, the following:

(1) If and when the child will be returned to the child's parent, guardian[,] or custodian in cases where the return of the child is best suited to the safety, protection[,] and physical, mental[,] and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian[,] or custodian is not best suited to the safety, protection[,] and physical, mental[,] and moral welfare of the child.

. . .

42 Pa.C.S.A. § 6351(f.1)(1) and (2). "Because the focus is on the child's best

interests, a goal change to adoption might be appropriate, even when a parent

substantially complies with a reunification plan." ***In re R.M.G.***, 997 A.2d 339, 347 (Pa. Super. 2010), *appeal denied*, 12 A.3d 372 (Pa. 2010); ***see also N.C.***, 909 A.2d at 826-827.

In the case *sub judice*, Mother asserts that the trial court erred in changing the permanency goal from one of reunification to one of adoption based upon a determination that no exception preventing the goal change existed under Section 6351(f)(9). Mother's Brief at 10. Mother contends that CYS "did nothing more than facilitate a [10] minute video [call] between [Mother and the Child] once each month" and, therefore, did not provide the necessary services to achieve reunification. ***Id.*** Mother further asserts that CYS "made no effort to assist her with [obtaining] housing [so it could] then expand [her] contact with [the Child]." ***Id.*** at 11. Mother argues that "while [CYS] may be required to seek a goal change when the [Child] has been in care for 15 out of the last 22 months, the [trial c]ourt is not required to grant such a request." ***Id.*** Mother argues that the trial court "abused its discretion by fixating on the [Section 6351(f)(9)] factor without giving fair consideration to when [Mother] will be released from custody and return to care for [the Child and that Mother] kept in contact with [the Child] each month while [he was] in placement and had a close relationship [with the Child from the time of his birth until he] entered placement." ***Id.*** at 12.

In support of its decision to change the permanency goal from one of reunification to one of adoption, the trial court explained,

[Section] 6351(f) "creates a mechanism for keeping [trial] courts alert to the potential for foster care drift, *i.e.*, where children languish in the foster care system while their parents unsuccessfully attempt to regain custody. Thus, once a child's placement in foster care reaches the fifteen-month threshold, [trial] courts are mandated to query whether the agency has initiated proceedings to terminate parental rights[. ]Specifically, if a child has been in custody for 15 of the last 22 months, the [trial] court must inquire as to whether a termination petition has been filed, absent the [applicability of one of the] listed exceptions [under Section 6351(f)(9)], including whether the parents have been provided necessary services.

At the time of the November 13, 2024[] goal change hearing, the Child had been in foster care placement for nearly 16 of the last 22 months. At both the July 10, 2024, and November 13, 2024[] hearings, the Child's caseworker reported that [the Child] was doing very well with his foster family, that he had completed all early intervention behavioral classes, [and] that he was comfortable with his foster parents leaving the room for video calls with Mother. By this time, the Child appeared to have bonded with his foster family.

[The trial] court originally scheduled the goal change hearing for July 10, 2024, but granted Mother's request to continue the hearing so that she would have more time to resolve her criminal charges and make stable housing arrangements. However, by the time of the November [13, 2024] goal change hearing, Mother was still incarcerated despite posting bail because she did not have a stable or permanent housing plan. When questioned by counsel for [CYS], Mother indicated in her responses that she did not know when[,] or if[,] she would have stable housing arrangements. At the time of the hearing, Mother was still awaiting her sentencing for the charges [to which] she pleaded [guilty], and [the trial] court was uncertain how long her incarceration would last.

Mother did not state that she had employment set up upon her release nor family support in Pennsylvania[. I]n fact, her family appears to reside in Louisiana. In addition, [CYS] would need to address Mother's mental health, parenting skills, and decision[-]making processes before [the trial court would permit] reunification with [the] Child. [The trial] court determined that this process could take several additional months on top of the 15 months the Child had already been in foster care.

> As required by statute, [CYS] was required to initiate proceedings to terminate the parental rights of Mother as the Child was in placement for 15 of the last [22] months. No exception to [Section 6351(f)(9)] applied. Despite additional time to make housing [and] employment arrangements, Mother did not have a stable housing plan upon her release from incarceration. At the time of [the trial] court's December 12, 2024[] order, the Child had been with his foster family for 16 months[. The Child] had bonded with his foster parents, he was developmentally on track, and his needs were being met. [The trial] court determined that it was not in the Child's best interest to continue to languish in the foster care system while [Mother] remained incarcerated and without stable housing or employment. Because of this, [the trial] court determined that it was in the Child's best interest to change his placement goal from reunification with Mother to permanency through adoption.

Trial Court Opinion, 2/7/25, at 8-10 (original brackets, citations, and extraneous capitalization omitted).

At the November 13, 2024 hearing, the caseworker testified that the Child had been in placement since July 18, 2023. N.T., 11/13/24, at 5. Therefore, at the time of the hearing, the Child had been in placement for 5-days short of 16 months. The caseworker explained that the Child was "doing very well" and was generally "on target" developmentally. *Id.* at 5-6. By way of example, the caseworker explained that, initially, the Child was terrified to be left alone but now was comfortable being outside the presence of the foster parents. *Id.* The caseworker agreed that the foster parents were meeting the Child's needs. *Id.* at 6. The caseworker stated that Father, as well as other family members, including maternal grandmother, were excluded as placement options for the Child. *Id.* at 8. The caseworker stated that she facilitated video calls between Mother and the Child. *Id.* at 6. CYS

has not, however, been able to provide Mother with additional services due to her incarceration. *Id.* at 8-9.

On cross-examination by Mother's counsel, the caseworker described the Child's relationship with Mother as one in which the Child will "show [Mother] the toys he's playing with, repeat words, colors, [and] numbers that [Mother] instructs him to repeat[, and] wave goodbye and blow a kiss goodbye when prompted." *Id.* at 11. The caseworker explained, however, that she did not feel the Child recognized the video calls with Mother as "a visitation between parent and child" but, rather, the Child recognized the caseworker "as the girl that comes with the [tele]phone to read books and talk to somebody else on a video call." *Id.* at 12. The caseworker was aware that, while incarcerated, Mother received "some certificates for her efforts [towards] rehabilitation." *Id.* at 14.

Finally, on cross-examination by the guardian *ad litem*, the caseworker explained that the reason for the request in goal change from one of reunification to one of adoption was due to the length of time the Child has been in foster case. *Id.* at 17. The caseworker explained that a determination as to the feasibility of reunification "would only be able to be determined if [Mother] was released from incarceration and [CYS was] able to move forward with in-person visits." *Id.* The caseworker agreed that the process of CYS establishing in-person visitation between Mother and the Child, and Mother finding suitable housing and obtaining employment would be greater than 6 months after Mother's release from incarceration. *Id.* at 17-18.

Mother testified that, while incarcerated, she obtained certificates in a parenting program, nutrition and food preparation, employment readiness and skilled career development, and community re-entry, as well as a 12-week drug and alcohol program. *Id.* at 20-21. Mother explained that, once released, her plan was to reside at a domestic violence shelter until she is able to obtain an apartment through a housing program. *Id.* at 21. Mother further stated that she has been on work release from her incarceration as part of a work program. *Id.* at 22. Mother described her relationship with the Child as "a good relationship." *Id.* at 21.

On cross-examination by CYS counsel, Mother acknowledged that her plan to reside at the domestic violence shelter was only temporary (30 to 60 days) and that she did not have permanent housing arranged due to her continued incarceration. *Id.* at 23. Mother explained that she had not received her release date yet, so she was not sure of the logistics regarding her housing situation. *Id.*

Upon review, we discern no abuse of discretion or error of law in the trial court's order changing the permanency goal from one of reunification to one of adoption. In ordering the goal change, the trial court considered, and the record supports, the factors required by Section 6351. As detailed in its permanency review order, the trial court found, *inter alia*, that the placement of the Child continues to be necessary and appropriate, that Mother demonstrated "minimal compliance" with the permanency plan and "no progress toward alleviating the circumstances which necessitated the original

placement," that the Child has been in placement for 15 of the last 22 months and the current plan of reunification is no longer appropriate or feasible, that the Child is safe, that reasonable efforts have been made by CYS to achieve the reunification plan, and that CYS will file a petition to terminate Mother's parental rights at an appropriate time. Permanency Review Order, 12/12/24; *see also* 42 Pa.C.S.A. § 6351(f). Mother takes issue with a single factor within the broader list of factors set forth in Section 6351, namely the trial court's determination that CYS provided necessary and reasonable services to Mother to assist her in reunification and that an exception under Section 6351(f)(9)(iii) does not exist. Section 6351(f)(9) "is merely one of a number of factors a trial court must consider in ultimately determining whether[, or not,] the current placement is appropriate[.]" *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). The sole focus of the trial court in a petition seeking the change of a goal in a permanency plan is on the best interest of the child and not that of the parent as a child's youth is too short and cannot be put on hold. *H.J.*, 206 A.3d at 25. As the trial court noted, the December 12, 2024 order does not terminate Mother's parental rights to the child but, rather, continues to move the child's life forward to avoid "foster-care drift." N.T., 11/13/24, at 28. Mother still has an opportunity to demonstrate her ability to parent, including, *inter alia*, her achievement of stable housing and consistent employment, at a later proceeding.

Mother continues to be incarcerated and, as such, CYS is unable to provide Mother with additional services until Mother is released. The

circumstances in the case *sub judice* do not give rise to an exception under Section 6351(f)(9). Therefore, we discern no error of law or abuse of discretion in the order changing the Child's permanency plan from a goal of reunification to one of adoption.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 6/4/2025